## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUMIO HOLDINGS, INC., *et al.,*[1] | Case No. 24-11916 (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (the "Motion"):

### RELIEF REQUESTED

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "Interim Order") and **Exhibit B** (the "Final Order"): (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief including the scheduling of the Final Hearing.

### JURISDICTION AND VENUE

2. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Lumio Holdings, Inc. (7119) and Lumio HX, Inc. (7401). The Debtors' headquarters is located at 1550 W Digital Drive, Suite 200, Lehi, UT 84043.

for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28

U.S.C. § 157(b).  Venue of these cases and the Motion is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

3.    The Debtors consent pursuant to rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware ("Local Rules") to the entry of a final order by the Court in connection with this Motion

to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

final orders or judgments in connection herewith consistent with Article III of the United States

Constitution.

4.    The statutory bases for the relief requested herein are sections 105(a),

362(d), 363(b), 507(a), and 541(b)(1) of the Title 11 of the United States Code (the "Bankruptcy

Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Local Rule 9013-1(m).

## BACKGROUND

5.    On September 3, 2024 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue

to manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.

6.    The Debtors are the largest privately held residential solar provider that is

fully vertically integrated with a full suite of photovoltaic solar system sales, installation and

operations.  The Debtors' fully integrated model allows them to control every interaction with their

customers to ensure superior service.

7.    Additional details regarding the Debtors, their business, the events leading

to the commencement of these cases, and the facts and circumstances supporting the relief

requested herein is set forth in the *Declaration of Jeffrey T. Varsalone in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed concurrently herewith and incorporated herein by reference.

## THE DEBTORS' EMPLOYEES

8.      As of the Petition Date, the Debtors employ approximately 1,250 employees and contractors, including, 132 full-time salaried employees, 155 full-time hourly employees, 802 salespeople[2] (as defined below), one part-time employee, and 165 independent contractors (collectively, the "Employees").  These numbers reflect a reduction-in-force that was implemented in early August by the Debtors which resulted in a reduction of the total number of full-time salaried and full-time hourly Employees by approximately 100.

9.      The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced.  Of the Debtors approximately 700 full-time Employees: approximately 425 are in sales; approximately 200 are in operations including strategic, corporate, filed and warehouse; and approximately 65 are in general administrative functions including finance, human resources, information technology, legal and executive.  Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maximize the value of their estates will be materially impaired.

10.     The Debtors' ability to run their business efficiently to maximize value for their estates depends on the expertise and continued support and service of their Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe

---

[2]     The Debtors employ a total of 802 salespeople but only 398 of them are considered "active."

that the continuity and competence of their workforce would be jeopardized if the relief requested herein is not granted.  Moreover, if the Debtors fail to pay prepetition Employee Obligations in the ordinary course of business, their workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  This would have a significant negative effect on workforce morale and productivity, and would risk immediate and irreparable harm to the Debtors' operations.

11.     Further, as set forth in the First Day Declaration, the salespeople are paid exclusively through sales commissions and operate in teams to canvass neighborhoods throughout the fourteen states in which the Debtors operate to sell their products.  The Debtors' ability to acquire customers—and thus generate revenue—depends upon this salesforce. The Debtors' survival depends upon retaining its salesforce, and the relief requested by this Motion provides the Debtors with the means to do that.

12.     As such, continuing all of the Compensation and Benefits Programs described in this Motion are vital to preventing the loss of key members of the workforce during the pendency of these chapter 11 cases (these "Chapter 11 Cases") and to maintaining the continuity and stability of the Debtors' operations.

### EMPLOYEE COMPENSATION AND BENEFITS

13.     The Debtors, by this Motion, seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments and Employees' share of insurance premiums), reimbursable expenses, health insurance, retirement health and related benefits, workers' compensation benefits, and certain other benefits that the Debtors have historically provided in the ordinary course

(collectively, the "Employee Compensation and Benefits"); and (b) pay all costs incident to the Employee Compensation and Benefits.

14.    The Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course during these Chapter 11 Cases in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

15.    By this Motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits (the "Prepetition Employee Obligations"):

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation | $1,000,000 | $1,000,000 |
| Withholding Obligations | $500,000 | $500,000 |
| Payroll Processing Fees | $5,000 | $5,000 |
| Reimbursable Expenses | $280,000 | $280,000 |
| Employee Benefits Programs | $305,000 | $305,000 |
| **Total** | **$2,090,000** | **$2,090,000** |

I.    **Employee Compensation and Withholding Obligations.**

A.    **Employee Compensation.**

16.    The Debtors' Employee compensation structure varies based on the classification of the particular employee.  For compensation purposes, the three main subsets of Employees are: (i) Employees whose compensation is either salary or hourly (the "Salary/Hourly Employees"); (ii) Employees whose compensation is salary or hourly but includes commissions based on the sales of the Debtors' solar products (the "Salary/Hourly Plus Commissions

Employees"); and (iii) Employees who are compensated exclusively by sales commissions (the "Commissions Only Employees").  In the ordinary course, the Employees are paid their gross wages, salaries, overtime, commissions, and other obligations described herein (collectively, the "Employee Compensation") (a) either bi-weekly for the Salary/Hourly Employees and Salary/Hourly Plus Commissions Employees and (b) weekly for the Commissions Only Employees.  In addition, the Commissions Only Employees are entitled to quarterly commissions as part of their compensation.

17.     As stated, the Debtors instituted a reduction-in-force in early August. Accordingly, the Debtors currently estimate average monthly gross Employee Compensation, including gross wages and salaries, commissions, and related compensation, to be approximately $6,300,000.  As of the Petition Date, the Debtors estimate that they owe approximately $2,500,000 on account of Employee Compensation earned by Employees prior to the Petition Date (the "Unpaid Compensation"), approximately $1,000,000 of which will come due within the first 21 days of these Chapter 11 Cases.  As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship and could harm the Debtors' operations and ability to maximize value.

18.     Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay their Employees any Unpaid Compensation in the ordinary course and consistent with past practice.  For the avoidance of doubt, by this Motion the Debtors do not seek to pay Unpaid Compensation to any Employee in excess of the $15,150 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code.

**B.      Withholding Obligations.**

19.     In the ordinary course, the Debtors deduct amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax

and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legal protection, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients. On average, the Debtors withhold approximately $100,000 in Deductions every two weeks from Employees' gross pay. As such, as of the Petition Date, the Debtors estimate that approximately $100,000 has accrued on account of Deductions.

20.     In addition to the Deductions, the Debtors also withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes"), for remittance to the appropriate federal, state, or local taxing authorities. The Debtors match the Employee Payroll Taxes. In addition, the Debtors pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Payroll Taxes" and with the Employee Payroll Taxes, the "Payroll Tax Obligations"). The Payroll Tax Obligations are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed. In the aggregate, the Debtors' monthly Payroll Tax Obligations total approximately $1,000,000 on average. As of the Petition Date, the Debtors estimate that they owe approximately $400,000 on account of Payroll Tax Obligations relating to the prepetition period, all of which will become due and payable during the first 21 days of these Chapter 11 Cases.

21.     As of the Petition Date, the Debtors estimate that the total amount of outstanding Deductions and Payroll Tax Obligations (together, the "Withholding Obligations") is approximately $500,000, all of which will come due during the interim period. By this motion,

the Debtors seek authority, but not direction, to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course during the administration of these Chapter 11 Cases.

**C.     Payroll Processing.**

22.     The Debtors use Onesource Virtual ("OSV") to administer their payroll, which includes calculating and processing gross-to-net payroll, issuing payroll payments to the appropriate funds transfer networks, generating pay statements and coordinating the payment of any Withholding Obligations.  The Debtors fund one of their bank accounts weekly with an amount sufficient to satisfy their payroll obligations.  OSV issues checks and initiates direct deposit ACHs that are drawn on the Payroll Account on the date of payment.  The Debtors pay OSV approximately $5,000 monthly for its services.  As of the Petition Date, the Debtors estimate they owe approximately $5,000 to OSV on account of payroll services (the "Unpaid Payroll Processing Fees"), all of which is coming due within the interim period.  By this Motion, the Debtors seek authority, but not direction, to pay the Unpaid Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing in the ordinary course during the administration of these Chapter 11 Cases.

**D.     Expense Reimbursement.**

23.     The Debtors, in the ordinary course of business, may reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that the Employees incur on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").  Most Employees initially incur and pay such Reimbursable Expenses by using personal funds or credit cards and are subsequently reimbursed by the Debtors after submission and approval of expense reimbursement reports.  Employees are expected to use sound judgment and good business sense when incurring such expenses.  Managers review and approve the Reimbursable

Expenses.  Once the managers have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse Employees directly for upfront expenses and remit payment to Bill Holdings Inc. ("Bill.com") for corporate card purchases.  The Debtors' inability to reimburse such expenses could impose hardship on such Employees, where such Employees otherwise incurred obligations for the Debtors' benefit.  The Debtors estimate that, as of the Petition Date, $30,000 is owed on account of prepetition Reimbursable Expenses.

24.    In addition, the Debtors provide certain Employees with credit cards (the "Corporate Credit Cards") issued by Bill.com (the "Corporate Credit Card Company") to be used in connection with the Employees' day-to-day functions. Depending on the type of Corporate Credit Card issued, Employees may use the Corporate Credit Cards to pay for job-related expenses (including, for example, inventory purchases) and/or work-related travel and similar expenses.  All Corporate Credit Cards issued by the Debtors to Employees have detailed restrictions on permissible expenditures, and Employees are responsible for any non-reimbursable amounts charged to the Corporate Credit Cards.  The Debtors estimate that they incur obligations under the Corporate Credit Cards of approximately $1,000,000 per month (the "Corporate Credit Card Obligations").  Payment of costs incurred through the use of the Corporate Credit Cards is made every Friday to Bill.com.  As of the Petition Date, the Debtors estimate that they owe $250,000 with respect to outstanding Corporate Credit Card Obligations.

25.    Further, certain Employees are provided with cards that can only be used to purchase gasoline (the "Gas Cards").  The Gas Cards are issued by Wex Inc.  As the Gas Cards are paid on a daily basis, the Debtors believe that only *de minimis* amounts are owed as of the Petition Date.

**II.    The Employee Benefits Programs.**

26.    The Debtors offer eligible Employees a large portfolio of benefits in a number of insurance and benefits programs, including, among other programs, medical, employee assistance, life and disability insurance, vision, dental, legal protection, retirement plans, and other employee benefit plans as described below (collectively, the "Employee Benefits Programs").

27.    The Employee Benefits Programs are a key component of Employee Compensation.  As described above, failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship and could harm the Debtors' operations. Accordingly, by this Motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs; and (b) continue to provide Employee Benefits Programs in the ordinary course during the administration of these Chapter 11 Cases.  As of the Petition Date, the Debtors estimate that they owe approximately $150,000 on account of the Employee Benefits Programs, excluding amounts collected from employees for their portion of premiums but not yet remitted to the insurers, all of which will come due within the interim period.  The Employee Benefits Programs are described in greater detail below.

**A.    Medical, Dental, and Vision Benefits.**

28.    The Debtors offer all eligible Employees, who are regularly scheduled to work 30 or more hours per week, and their dependents, the opportunity to participate in medical coverage through Regence Blue Cross Blue Shield Networks (the "Health Benefit Plans").  These Health Benefit Plans are administered in-house by the Debtors.  Premiums for the Health Benefit Plans are shared approximately 60% by the company and 40% by the employees. The Debtors pay, on average, approximately $140,000 per month to cover outstanding claims and fees associated with the Health Benefit Plans. The Debtors estimate that, as of the Petition Date, $140,000 is owed on account of the Health Benefit Plans.

29.     Additionally, the Debtors offer all eligible Employees the option of participating in a dental plan (the "Dental Plan") administered by MetLife. Premiums for the Dental Plan are shared approximately 50% by the employees and 50% by the company. The company portion is approximately $20,000 per month. The Debtors estimate that, as of the Petition Date, $10,000 is owed on account of the Dental Plan.

30.     The Debtors also offer all eligible Employees the option of participating in a vision plan administered through SuperiorVision (the "Vision Plan").  Premiums for the Vision Plan are paid 100% by Employees.  Accordingly, there are no amounts owed by the Debtors as of the Petition Date with respect to the Vision Plan.

**B.      Health Savings Account.**

31.     Employees enrolled in certain Health Benefit Plans may elect to participate in the Debtors' tax-advantaged health savings account (the "HSA Plan") administered by Health Equity, Inc. (the "HSA Plan Administrator"), under which the Debtors offer eligible Employees the ability to contribute a portion of their pre-tax compensation to a health savings account to pay for qualified out-of-pocket health care expenses for the Employee and qualified dependents. Employees who elect to participate in the HSA Plan must contribute a minimum of $10.00 per paycheck to the HSA Plan as a deduction.  The Debtors contribute $500 yearly for a Health Benefit Plan that covers only the Employee and $1,000 yearly for a Health Benefit Plan that covers an Employee and a dependent.  The Debtors pay approximately $300 as a monthly administration fee to the HSA Plan Administrator.

**C.      Life and Disability Insurance.**

32.     The Debtors provide all eligible Employees with basic life and basic accidental death and dismemberment insurance coverage through MetLife in the event of serious

illness, injury or death ("Basic Life/AD&D Insurance").  The Debtors also offer short-term and

long-term disability coverage ("Disability Coverage") through MetLife, in the event an Employee

becomes unable to work due an illness or injury.  The Debtors' cover 100% of the premiums for

Basic Life/AD&D Insurance and Disability Coverage which costs the Debtors approximately

$11,000 per month.

> ### D.    Other Welfare Programs.

33.    In addition to the foregoing, the Debtors have in place miscellaneous

practices, programs, and policies that provide medical and welfare benefits to eligible Employees,

including COBRA, critical illness insurance, voluntary legal services and other programs

(collectively, the "Other Welfare Programs").  The Debtors believe that the Other Welfare

Programs are important to maintaining Employee morale and assisting in the retention of the

Debtors' Employees.  The monthly cost of such programs for the Debtors is negligible in the

context of the Debtors' aggregate compensation and benefit obligations.  By way of example, there

is no cost to the Debtors for the COBRA offering as the Debtors are reimbursed 100% for the

premiums paid out. The Debtors believe that failing to honor expected benefits under such Other

Welfare Programs, as well as the other Health and Welfare Benefits, would have an adverse effect

on the Employees.  As the Welfare Programs are 100% paid for by Employees, the Debtors do not

owe any amounts on account of the Other Welfare Programs.

> ### E.    Workers' Compensation.

34.    The Debtors maintain workers' compensation insurance that provides

coverage for employee-related injuries, disability or death, as required by applicable state laws

(the "Workers' Compensation Program").  Currently, the Debtors have workers' compensation

insurance policies with The Hartford and, solely with respect to Employees in Washington State,

Washington Labor & Industries (the "Workers' Compensation Insurers").  The Debtors pay an

annual premium in connection with the Workers' Compensation Program of approximately $2,500,000 based upon a fixed rate established and billed by the Workers' Compensation Insurer (the "Workers' Compensation Insurance Premium").  Further, the Debtors are required to maintain $3,200,000 in a separate bank account to support a letter of credit with respect to the Workers' Compensation Program.  As of the Petition Date, the Debtors are current on their Workers' Compensation Insurance Premium.  The Debtors estimate that they have approximately $45,000 outstanding for other obligations on account of the Workers' Compensation Program as of the Petition Date.

      **F.**      **Employee Retirement Plans.**

      35.      The Debtors maintain a 401(k) savings plan, a qualified defined contribution plan pursuant to section 401(k) of the Internal Revenue Code, for all Employees (the "401(k) Plan").  The 401(k) Plan is provided and administered by The Standard.  The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code and provides a matching contribution by the Debtors of 100% up to the first 1% of what an Employee contributes to his or her account, and 50% on the net 5% an Employee contributes subject to mandated limitations (the "401(k) Matching Contribution").  Approximately 407 Employees currently participate in the 401(k) Plan with monthly contributions to the 401(k) Plan totaling approximately $215,000.  This includes approximately $140,000 of Employee contributions, made up of withholdings from participating Employees' paychecks, and approximately $225,000 of 401(k) Matching Contributions.  As of the Petition Date, the Debtors believe they owe $37,000 on account of the prepetition 401(k) Matching Contribution, all of which will become due and payable within the first 21 days of these Chapter 11 Cases.  The 401(k) Plan requires the Debtors to make a recordkeeping and administrative fee quarterly of approximately $1,200.

G.      **Paid Time Off.**

36.      The Debtors maintain several paid leave benefit programs for their Employees, providing paid leave for personal time off ("PTO"), holidays, and other paid leave (collectively, the "Paid Leave").  Employees paid on an hourly basis are initially given 3.07 hours of PTO each pay period, which increases based on length of service.  Salary Employees have an open PTO policy whereby there is no set amount of time off.  However, these Employees must receive permission from management before taking PTO.  When an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate.  Hourly Employees are entitled to a cash payment for unused accrued PTO in the event that such Employee is terminated from the Debtors' employment or when transitioned to a salaried employee.  Remaining PTO balances for hourly Employees roll over each year.  As of the Petition Date, the Debtors estimate that approximately $151,000 in PTO has been earned by Employees.  Accordingly, pursuant to this Motion, the Debtors request authority to (i) honor their PTO policy in the ordinary course of business and consistent with past practices, whether accrued pre- or postpetition, and (ii) subject to entry of the Final Order, pay the value of accrued PTO to any Employees terminated on or after the Petition Date, including, in excess of the cap imposed by section 507(a)(4) of the Bankruptcy Code, as required under applicable state law.

## BASIS FOR RELIEF

I.      **Honoring the Employee Compensation and Benefits Is Essential to Maintaining and Maximizing the Value of the Debtors' Estates.**

35.      The Debtors' business depends upon its reliable and loyal Employees.  Honoring the Employee Compensation and Benefits is essential to ensure such reliability and loyalty.  Failing to promptly honor such obligations, even to the former employees who were recently terminated, will create doubt and concern among the Employees, and could lead to a

significant loss of Employees.  Significant loss of Employees at this critical time would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all parties.

36.     Therefore, the Debtors seek the relief in this Motion on several bases under the Bankruptcy Code.  First, the Debtors should be permitted to pay these obligations because many if not all are or may be entitled to priority under section 507 of the Bankruptcy Code.  Second, the Debtors should be permitted to pay and remit Withholding Obligations because under section 541 of the Bankruptcy Code many if not all of these amounts do not constitute property of the Debtors' estates.  Third, the Debtors should be permitted to satisfy the Unpaid Compensation in the ordinary course of business pursuant to section 363 of the Bankruptcy Code.  Finally, honoring the Employee Compensation and Benefits is a sound exercise of the Debtors' business judgment, and permissible under the "doctrine of necessity."

**A.     The Employee Compensation and Benefits are Ordinary Course Transactions Authorized by Section 363(c) of the Bankruptcy Code.**

37.     As an initial matter, the Debtors believe that continuing to provide the various Employee Compensation and Benefits is within the Debtors' ordinary course of business and therefore authorized under section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  "The framework of section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).

38.     To maintain operations and preserve the value of their estates, it is essential that the Debtors retain the uninterrupted services and loyalty of the Employees.  The continuation

of the various Employee Compensation and Benefits as detailed herein is necessary to ensure that the Debtors have sufficient Employees and adequate services during these Chapter 11 Cases to maximize the value of their estates for all creditors.  The Debtors are particularly concerned with trying to minimize the personal hardship Employees may suffer as a result of the commencement of these Chapter 11 Cases.

39.     Accordingly, the Debtors submit that the relief requested herein is (i) critical to their ability to operate effectively and preserve the value of their estates throughout these Chapter 11 Cases and (ii) in the best interests of the Debtors, their estates, and their creditors.

40.     Subject to the Court's approval, the Debtors seek authority, but not direction to continue to pay all postpetition amounts related to the Employee Compensation and Benefits and to continue honoring the Employee Compensation and Benefits in the ordinary course postpetition. Out of an abundance of caution, the Debtors further request the authority to modify, change, or discontinue any of the Employee Compensation and Benefits during the pendency of these Chapter 11 Cases in the Debtors' sole discretion without the need for further Court approval, subject to applicable law.

> **B.     Paying Certain Withholding Obligations Is Required by Law Under Section 541 of the Bankruptcy Code.**

41.     The Debtors also seek authority to pay Withholding Obligations to the appropriate entities.  These amounts principally represent amounts that Employees, governments, and judicial authorities have designated for withholding from Employees' paychecks.  These withholdings include child support and alimony payments, which are not considered property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(7) and (d).

42.     Similarly, applicable U.S. federal and state laws require the Debtors to withhold federal, state and local income taxes from Employees' paychecks and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–96 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  These unremitted Withholding Obligations are also not property of the Debtors' estates and, accordingly, the Debtors request that the Court authorize them to transmit the unremitted Withholding Obligations to the proper parties in the ordinary course of business.

**C.     Payment of the Prepetition Employee Compensation and Benefits Obligations Is a Sound Exercise of the Debtors' Business Judgment and Is Appropriate Under Section 363 and 105(a) of the Bankruptcy Code.**

42.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b)of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions."  Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp. (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code) (internal citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring a "good business reason" for a sale under section 363 of the Bankruptcy Code); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003) (requiring a "good business reason" for disposition of assets outside of the ordinary course in bankruptcy); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (same).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006).

43.     In addition to being justified under section 363(b)(1) of the Bankruptcy Code, payment of the Employee Compensation and Benefits is warranted under the doctrine of necessity.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) and the "doctrine of necessity," the Court may use its broad grant of equitable power to permit the payment of the Employee Compensation and Benefits when such payment is essential to the continued operation of the debtor's business.  *See, e.g. In re Just for Feet, Inc.,* 242 B.R. 821, 824-45 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtors' survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to the confirmation of a reorganization plan).

44.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581

(3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l, Inc. v. Motor Coach Indus. Int'l, Inc.* (*In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that there is no serious basis to challenge doctrine of necessity in the Third Circuit); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *Just for Feet*, 242 B.R. at 824–26 (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to the continued operation of business).

45.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy of Chapter 11."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("A general practice has developed . . . where

bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").  Moreover, Bankruptcy Rule 6003 itself implies that the payment of Prepetition Workforce Obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.

46.     It is a sound exercise of the Debtors' business judgment to pay the Prepetition Employee Obligations because doing so will help the Debtors avoid the potential for a value-destructive interruption to their business operations during these Chapter 11 Cases.  For the reasons discussed herein, payment of the Prepetition Employee Obligations enhances value for the benefit of all interested parties.  Ultimately, the maximization of value of the Debtors' estates is inextricably tied to their workforce.  The Debtors cannot afford to lose their workforce, who are critical to the Debtors' going concern value as described in the First Day Declaration.  Moreover, most of the Debtors' Employees rely exclusively on the Prepetition Employee Obligations to satisfy their daily living expenses.  If amounts owed are not received or other benefits are delayed, the Employees may be exposed to significant financial hardship and, in some cases, will be unable to meet their basic needs, which may make continuing to work for the Debtors impossible.  If the Debtors are unable to satisfy their various compensation and benefits obligations, the Employees will suffer at a time when their support is critical to the Debtors.  Therefore, in order to provide certainty to the Debtors' Employees, maintain morale and productivity, limit attrition and minimize the adverse effect of the commencement of these Chapter 11 Cases, it is necessary to continue providing ordinary course compensation and benefits.  Moreover, for the avoidance of

doubt, no Employee will receive payment under this Motion in excess of the statutory cap of $15,150 on account of any existing and outstanding Prepetition Employee Obligations as of the Petition Date.  Accordingly, payment of the Employee Compensation and Benefits is warranted under section 363(b) and the doctrine of necessity.

47.     Further, certain of the Employee Compensation and Benefits are entitled to priority under section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Thus, granting the relief sought in this motion is likely to only affect the timing of such payments to Employees, and should not negatively affect recoveries for general unsecured creditors.

48.     Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here.  *See, e.g.*, *In re Timber Pharmaceuticals, Inc. et al.,* Case No. 23-11878 (JKS) (Bankr. D. Del. Dec. 13, 2023) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Town Sports Int'l, LLC*, Case No. 20-12168 (CSS) (Bankr. D. Del. Sept. 16, 2020) (same); *In re Extraction Oil and Gas, Inc.*, Case No. 20-10548 (Bankr. D. Del. July 13, 2020) (same); *In re APC Automotive Technologies Intermediate Holdings*, LLC, Case No. 20-11466 (CSS) (Bankr. D. Del. June 4, 2020) (same); *In re Akorn, Inc.*, Case No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay Prepetition Employee Obligations and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

## II.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

49.     Section 362(a) of the Bankruptcy Code operates to stay:

> "the commencement or continuation, including the issuance
> or employment of process, of a judicial, administrative, or

> other action or proceeding against the debtor that was or
> could have been commenced before the commencement of
> the case under this title, or to recover a claim against the
> debtor that arose before the commencement of the case
> under this title . . . ."

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other

parties-in-interest to request a modification or termination of the automatic stay for "cause."  11

U.S.C. § 362(d)(1).

50.    The Debtors seek authorization under section 362(d) of the Bankruptcy

Code to permit their Employees to proceed with their claims under the Workers' Compensation

Policies in the appropriate judicial or administrative forum.  The Debtors believe that cause exists

to modify the automatic stay because staying an employee's workers' compensation claim could

have a detrimental effect on the financial well-being and morale of the Employees and lead to the

departure of certain Employees.  As discussed above, such departures could cause a severe

disruption in the Debtors' business to the detriment of all stakeholders.  Accordingly, the Debtors

request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation

Claims to proceed.

## SATISFACTION OF BANKRUPTCY RULE 6003

51.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within

twenty-one (21) days after the filing of the petition regarding a motion to "use, sell, lease, or

otherwise incur an obligation regarding property of the estate" only if such relief is necessary to

avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable

harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten

the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2

(Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation

to Bankruptcy Rule 4001).

52.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without authorization for the relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

### RESERVATION OF RIGHTS

53.     Nothing contained in this motion or any actions taken by the Debtors pursuant to relief granted in the Orders is intended or should be construed as:  (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

54.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request

that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

55.     The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware (Attn: Joseph Cudia, Esq. (joseph.cudia@usdoj.gov) and Fang Bu, Esq. (fang.bu@usdoj.gov)); (b) counsel to the Debtors' proposed debtor in possession financing lender; (c) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (d) all parties asserting liens against the Debtors' assets; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for all states in which the Debtors conduct business or have conducted business; and (i) any party that requests service pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


*[Remainder of page left intentionally blank]*

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Interim Order, substantially in the form attached hereto as **<u>Exhibit A</u>** granting the relief requested in this Motion, including scheduling a final hearing on this Motion; (ii) thereafter enter the Final Order substantially in the form attached hereto as **<u>Exhibit B</u>**; and (iii) grant such other and further relief as the Court may deem proper.


Dated:  September 3, 2024
Wilmington, Delaware

Respectfully submitted,

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney, Sr.*
Robert J. Dehney, Sr. (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
Erin L. Williamson (No. 7286)
1201 Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email: rdehney@morrisnichols.com
      mharvey@morrisnichols.com
      mtalmo@morrisnichols.com
      sjones@morrisnichols.com
      ewilliamson@morrisnichols.com


*Proposed Counsel to the Debtors and*
*Debtors in Possession*