## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUMIO HOLDINGS, INC., *et al.*,[1] | Case No. 24-11916 (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
## (I) AUTHORIZING PAYMENT OF PREPETITION CLAIMS
## OF CERTAIN CRITICAL VENDORS AND
## (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors"),
respectfully move (the "Motion") as follows:

### RELIEF REQUESTED

1.      The Debtors seek entry of interim and final orders, substantially in the form
attached hereto as **Exhibit A** (the "Interim Order") and **Exhibit B** (the "Final Order,"): (i)
authorizing the Debtors, in their sole discretion, to pay prepetition claims of certain vendors that
are critical to the Debtors' ongoing business operations (the "Critical Vendors") in an amount not
to exceed $685,000 on an interim and $1,370,000 on a final basis (the "Critical Vendors Claims
Cap"); and (ii) granting related relief including scheduling a Final Hearing.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§
157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court
for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification
number, are Lumio Holdings, Inc. (7119) and Lumio HX, Inc. (7401).  The Debtors' headquarters is located at
1550 W Digital Drive, Suite 200, Lehi, UT 84043.

U.S.C. § 157(b).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 364, 503(b)(9), 507(a), 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), as supplemented by rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(m).

## **BACKGROUND**

5.     On September 3, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.

6.     The Debtors are the largest privately held residential solar provider that is fully vertically integrated with a full suite of photovoltaic solar system sales, installation and operations.  The Debtors' fully integrated model allows them to control every interaction with their customers to ensure superior service.

2

7.     Additional details regarding the Debtors, their businesses, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Jeffrey T. Varsalone in Support of Chapter 11 Petitions and First Day Relief* (the "<u>First Day Declaration</u>"), filed concurrently herewith and incorporated herein by reference.

<u>**FACTS SPECIFIC TO THE RELIEF REQUESTED**</u>

I.     **Critical Vendors.**

8.     The Debtors' continued business operations require uninterrupted goods and services from the Debtors' Critical Vendors.  The Debtors' Critical Vendors consist of indispensable distributors, installers and software providers who are essential to the Debtors' operations (the "<u>Critical Products and Services</u>").  The Debtors enter bankruptcy with the primary goal of preserving and maximizing the value of their assets.  Without these Critical Products and Services, the Debtors would be unable to meet the needs of their businesses, serve their customers or maintain their market share and reputation within the highly competitive solar energy industry.

9.     The Debtors obtain their Critical Products and Services from highly specialized vendors, often on an order-by-order basis and without long-term contracts.  The Debtors believe that the trade relationships with the Critical Vendors may materially deteriorate if, due to the commencement of these chapter 11 cases (these "<u>Chapter 11 Cases</u>"), the Debtors are unable to pay the Critical Vendor Claims (as defined below) as requested herein.  As such, it is essential that the Debtors retain the ability to pay a portion of prepetition Critical Vendor Claims that are necessary to maintain the stability of the Debtors' businesses.  The Debtors' stakeholders, employees, vendors and—most importantly—the Debtors valued customers, would be irreparably harmed if a stoppage were to occur.

10.     The Debtors rely on the Critical Vendors to fulfill their customer obligations.  Many of the Critical Vendors provide unique materials and services that would be difficult, if not impossible, to replace without incurring significant costs or significant disruption to the Debtors' businesses.  These essential materials and services include solar panels, inverters, batteries and the skilled labor required to install these intricate and delicate materials.  Given their nature, many of the Critical Products and Services are available only from a sole or limited source.

11.     The Critical Vendors, both foreign and domestic, have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date, and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date. If the Critical Vendors cease providing the Critical Products and Services to the Debtors, the Debtors may not be able to locate alternative sources on reasonable commercial terms, or at all. Even a temporary halt of the Critical Products and Services would significantly reduce the efficiency of the Debtors' operations and, in certain instances, could require the suspension of operations altogether.  Such a delay would also prevent the Debtors from honoring existing commitments to customers.  This potential harm and disruption would far outweigh the costs of payment of the Critical Vendor Claims. Accordingly, maintaining the ability to pay Critical Vendor Claims will stabilize the Debtors' operations, assist with the Debtors' reorganization efforts and ultimately maintain stakeholder value.

12.     By this Motion, the Debtors seek authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $685,000 million on an interim basis and $1,370,000 million on a final basis, on account of prepetition claims held by Critical Vendors and accrued in the ordinary course of business (collectively, the "Critical Vendor Claims").  The Debtors are not seeking to pay all Critical Vendor Claims immediately.  Rather, if authorized by

the Court, the Debtors will process only those payments they determine in their business judgment to be critical for the Debtors' operations. The Debtors further request that the Court grant the Debtors the authority to allocate the forgoing amounts at the Debtors' discretion without prejudice to seeking additional relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

## II.     Foreign Vendors.

13.     Certain of the Critical Vendors are foreign vendors (collectively, the "Foreign Vendors").  In the ordinary course of business, the Debtors incur obligations to numerous suppliers of goods and services that are crucial to the Debtors' ongoing operations and whose assets are located exclusively outside of the United States. Maintaining existing relationships with the Foreign Vendors is critical to continuing the Debtors' business, and replacing these Foreign Vendors would be time-consuming, impracticable (and in many local jurisdictions, impossible) and cost prohibitive.

14.     Foreign Vendors are also often unfamiliar with the United States bankruptcy process. Short of severing their contractual relations with the Debtors, nonpayment of prepetition claims may cause the Foreign Vendors to take other precipitous actions, including delaying shipments or the provision of services, or initiating a lawsuit in a foreign court to collect prepetition amounts owed to them.  Although the automatic stay applies to protect the Debtors' assets wherever located, the Foreign Vendors may erroneously believe that they are not subject to, or otherwise ignore, the automatic stay of section 362 of the Bankruptcy Code. Moreover, attempting to enforce the Bankruptcy Code in foreign countries may be impractical or uneconomical.

**III.    503(b)(9) Claims.**

15.    Certain Critical Vendors may have delivered goods to the Debtors within 20 days prior to the Petition Date.  Section 503(b)(9) of the Bankruptcy Code provides that such claims (the "503(b)(9) Claims) hold administrative expense priority against the applicable Debtor's estate.  Such 503(b)(9) Claims, therefore, must be paid in full to confirm a plan of reorganization.  *See* 11 U.S.C. §§ 1129(a)(9)(A) (requiring payment in full of claims entitled to priority).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a confirmed plan.  Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation.  The Debtors believe that payment of such 503(b)(9) Claims is in the best interest of the Debtors' estates and will prevent detrimental changes to trade terms or a refusal to do business together.

16.    The Debtors also believe that such payments will further induce Critical Vendors to adhere to favorable trade terms and continue business on a go-forward basis.  Failure to honor these 503(b)(9) Claims in the ordinary course of business—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  The payment of 503(b)(9) Claims will prevent material disruptions to the Debtors' businesses, and failure to pay could impair the Debtors' ability to stabilize their businesses at this critical juncture to the detriment of all stakeholders.  For the avoidance of doubt, the Critical Vendor Claims are inclusive of the 503(b)(9) Claims and the Debtors are not seeking to additional amounts relative to these claims.

**IV.     Criteria for Selecting Critical Vendors.**

17.     To identify vendors that are essential to the Debtors' business, the Debtors carefully reviewed their vendor and service providers to determine which vendor could satisfy the criteria of being deemed critical to the Debtors' continued operations.  Among other things, the Debtors reviewed their accounts payable and prepetition vendor list to identify any and all creditors who are critical based upon the necessity of the goods or services supplied by the vendor, the likelihood that the vendor would cease to do business with the Debtors or otherwise materially disrupt the Debtors' businesses absent payment, the ease or possibility of replacing the vendor if necessary and the existence or terms of any agreements with such creditors.

18.     The Debtors are confident that this process appropriately identified only those vendors that, if the Debtors failed to pay for the vital goods and services they provided prepetition, would likely cease providing necessary goods and services in the future or would impose unworkable terms or conditions, and for which alternatives were not available or practical.

**V.     Proposed Terms and Conditions of Payment of the Critical Vendor Claims.**

19.     To preserve liquidity during these Chapter 11 Cases and ensure that the Debtors continue to receive vital goods and services, the Debtors propose to condition payment on account of Critical Vendor Claims on such Critical Vendor's agreement that it will continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one hundred eighty (180) days of the Petition Date (the "Customary Trade Terms").  The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to paying any Critical

Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein), to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

20.     The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors may send a letter, substantially in the form attached hereto as **Exhibit C**, to the Critical Vendors to which the Debtors are making such payment, along with a copy of either the Interim or Final Order (the "Order") granting this Motion.  The letter may include, without limitation, the following terms:

(a)     The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the Order and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

(b)     The amount of payment toward the Critical Vendor's estimated claim;

(c)     The Critical Vendor's agreement to be bound by the Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

(d)     The Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor postpetition in accordance with such terms;

(e)     The Critical Vendor's agreement not to file or otherwise assert against the Debtors, their estates or their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

(f)     The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the Order and consents to be bound thereby;

(g)     The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation or Bankruptcy Code section 503(b)(9) claim; and

(h)     If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, any payments received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

20.     Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").  The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine that such an agreement is necessary to their postpetition operations.

21.     In addition to the Trade Agreement described in paragraph 20, the Debtors seek authority to agree on Customary Trade Terms with Critical Vendors by less formal means, including email correspondence.  While the Critical Vendors provide crucial goods and services to the Debtors' business, many of these Critical Vendors are small businesses and the amounts owed to many vendors are relatively small.  These Critical Vendors may find the process of entering into a formal Trade Agreement overly burdensome, which for some may require hiring outside counsel to review the Trade Agreement.  To avoid the risk of Critical Vendors refusing to provide their goods and services and potential interruptions to the supply of vital goods and

services, the Debtors request authority to negotiate and agree on Customary Trade Terms with certain Critical Vendors absent a Trade Agreement as the Debtors deem appropriate.

22.     If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority and without further order of the Court but with notice to the affected Critical Vendor (i) to declare such Trade Agreement immediately terminated (if applicable) and (ii) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

23.     In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation.  In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment of its Critical Vendor Claim.

## BASIS FOR RELIEF REQUESTED

**I.      Payment of the Critical Vendor Claims Is Appropriate Under Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.**

21.     The relief requested is appropriate under sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors in

possession under sections 1107(a) and 1108 of the Bankruptcy Code, and are therefore fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*  Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("the bankruptcy court has considerable discretion" in granting motions pursuant to section 363(b)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that section 363(b) provides a court "broad flexibility" to authorize a debtor to satisfy prepetition claims where supported by a proper business justification); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("Section 105(a) of the Code provides a statutory basis for the payment of pre-petition claims."). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 497.

22.     Section 363(b) of the Bankruptcy Code empowers the Court to allow a debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1); *see also In re Just For Feet, Inc.*, 242 B.R. at 825 ("The Supreme Court, the Third Circuit, and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11.").  For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, including the payment of prepetition claims, the debtor must "articulate some business

justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175; *see also In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'") (citing *In re Lehigh & N.E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (stating that the bankruptcy court's prior determination to permit payment of prepetition claims under section 363(b) was justified).

23.    Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175. Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. at 825 ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's reorganization."); *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (recognizing that the doctrine of necessity "permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation").

24.    Courts in this district have recognized the "necessity of payment" doctrine. *See, e.g., In re Energy Future Holdings Corp.*, 561 B.R. 630, 642-43 (Bankr. D. Del. 2016) ("The Third Circuit has explained that a 'necessity of payment' rule is intended to benefit all parties and is applicable when such payment is critical to the Debtors' reorganization."); *In re Lehigh & N. E. Ry. Co.*, 657 F.2d at 581 ("[T]he 'necessity of payment' doctrine . . . teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor] during reorganization, payment may be authorized even if it is made out of corpus.").

25.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[A] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving

payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

26.     The payment of the Critical Vendor Claims represents a sound exercise of the Debtors' business judgment and is necessary for the Debtors' operations and the going concern value of their estates. Payment of the Critical Vendor Claims as they become due in the ordinary course of business is critical to the Debtors' uninterrupted operations as such payments will facilitate the ongoing delivery of goods and services required by the Debtors to fulfill customer orders and continue generating revenue. Nonpayment of the Critical Vendor Claims would likely result in Critical Vendors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services in compliance with onerous and commercially unreasonable terms. This could cause irreparable harm to the Debtors' businesses, goodwill and market share in the highly competitive solar energy market. Replacement vendors and the search for such vendors, to the extent even available, would likely result in substantially higher costs for the Debtors and subject the Debtors to risk of operational shutdown.

27.     Courts in this district have routinely granted relief similar to the relief requested herein. *See, e.g., In re Number Holdings, Inc.*, et al., Case No. 24-10719 (JKS) (May 7, 2024) (D.I. 418) (approving payment to critical vendors, foreign vendors and lien claimants); *In re Boxed, Inc.*, Case No. 23-10397 (BLS) (Apr. 25, 2023) (D.I. 162) (same); *In re TPC Group Inc.*, Case No. 22-10493 (CTG) (June 7, 2022) (D.I. 341) (authorizing payment to critical vendors, certain suppliers and lien claimants); *In re Akorn, Inc.*, Case No. 20-11177 (KBO) (June 11, 2020) (D.I. 161) (authorizing payment to critical vendors, foreign vendors and lien claimants); *In re Bluestem Brands, Inc.*, Case No. 20-10566 (MFW) (Mar. 30, 2020) (D.I. 151) (authorizing payment to foreign vendors and lien claimants); *In re Extraction Oil & Gas, Inc.*, Case No. 20-

11548 (CSS) (July 13, 2020) (D.I. 239) (authorizing payment to foreign vendors, lien claimants and health and safety suppliers, among others); *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Nov. 14, 2020) (D.I. 465) (authorizing payment to critical vendors and foreign vendors). Accordingly, the Debtors submit that the relief requested herein is necessary, appropriate and in the best interest of the Debtors' estates.

## II.    Certain of the Critical Vendor Claims May Constitute 503(b)(9) Claims.

28.    Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Moreover, the timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"); 4 Collier on Bankruptcy ¶ 503.16[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[P]rior to confirmation bankruptcy courts have discretion to determine when section 503(b)(9) claims should be paid."). The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve their operations. Absent payment of the 503(b)(9) Claims at the outset of these Chapter 11 Cases— which merely accelerates the timing of payment and not the ultimate treatment or recovery of such claims—the Debtors could be denied access to the goods necessary to maintain the Debtors' businesses and maximize the value of the Debtors' estates.

29.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation.  As administrative claims incurred in the ordinary course of business, the Debtors believe it may pay such claims in accordance with its business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, Hr'g Tr. at 49:21–23, *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (D.I. 153) ("THE COURT: . . . I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  Again, the timing of such payments lies squarely within the Court's discretion. *See In re Glob. Home Prods., LLC*, Case No. 06- 10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).

30.     Courts in this district have routinely granted relief similar to the relief requested herein. *See, e.g., In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (LSS) (June 21, 2023) (D.I. 192) (authorizing payment to 503(b)(9) claimants); *In re Boxed, Inc.*, Case No. 23-10397 (BLS) (Apr. 25, 2023) (D.I. 162) (same); *In re Gold Standard Baking, LLC*, Case No. 22-10559 (JKS) (July 18, 2022) (D.I. 136) (same); *In re TPC Group Inc.*, Case No. 22-10493 (CTG) (June 7, 2022) (D.I. 341) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020) (D.I. 161) (same).  Accordingly, the Debtors submit that the payment of 503(b)(9) Claims is necessary, appropriate and in the best interest of the Debtors' estates.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

31.     In order for a debtor to obtain relief to make payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re WorldSpace, Inc.*, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to avoid irreparable harm to the

debtors and their estates because such relief was essential for the continued operation of the debtors' businesses).

32.     Immediate and irreparable harm would result if the relief requested herein is not granted.  Access to the goods and services supplied by the Critical Vendors is essential to the preservation of the value of the Debtors' businesses and assets.  Should any Critical Vendor refuse or discontinue service, even for a brief period, the Debtors' businesses could be severely disrupted, and such disruption would jeopardize the Debtors' operations.  These effects would have an adverse impact to the Debtors' businesses, thereby causing immediate and irreparable harm.

33.     Failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the value of the Debtors' assets and maximize the value of the estates for the benefit of all stakeholders.  Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

34.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.

## **RESERVATION OF RIGHTS**

35.    Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity, amount or priority of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim; (iii) a promise or requirement to pay any claim; (iv) a waiver of any claim or cause of action of the Debtors that exist against any entity; (v) a ratification or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; (vi) a waiver of limitation of the Debtors' rights under the Bankruptcy Code, any other applicable law, or any agreement; or (vii) an admission or concession by the Debtors that any lien acknowledged or satisfied under this Motion is valid, and the Debtors expressly reserve and preserve their rights to contest the extent, validity, or perfection, or seek avoidance of, any such lien.

## **NOTICE**

36.    Notice of this Motion will be provided to: (a) the Office of the United States Trustee (Attn: Joseph Cudia, Esq. (joseph.cudia@usdoj.gov) and Fang Bu, Esq. (fang.bu@usdoj.gov)); (b) counsel to the Debtors' proposed debtor in possession financing lender; (c) the Internal Revenue Service; (d) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (e) the United States Attorney for the District of Delaware; (f) the Securities and Exchange Commission; (g) the state attorneys general in states where the Debtors are authorized to do business; and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002-1.  Notice of this Motion and any order entered in connection with this Motion will be served on all parties in accordance with Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice of this Motion is required.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, (b) enter the Final Order, substantially in the form attached hereto as **Exhibit B**, and (c) grant such other and further relief as is just and proper.

Dated:  September 3, 2024
Wilmington, Delaware

Respectfully submitted,

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney, Sr.*
Robert J. Dehney, Sr. (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
Erin L. Williamson (No. 7286)
1201 Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email: rdehney@morrisnichols.com
        mharvey@morrisnichols.com
        mtalmo@morrisnichols.com
        sjones@morrisnichols.com
        ewilliamson@morrisnichols.com

*Proposed Counsel to the Debtors and Debtors in Possession*