**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUMIO HOLDINGS, INC., *et al.*,[1] | Case No. 24-11916 (JKS) |
| Debtors. | (Jointly Administered) |

## COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF LUMIO HOLDINGS, INC. AND LUMIO HX, INC.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney, Sr. (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
        mharvey@morrisnichols.com
        mtalmo@morrisnichols.com
        sjones@morrisnichols.com


*Counsel to the Debtors and Debtors in Possession*

December 13, 2024

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Lumio Holdings, Inc. (7119) and Lumio HX, Inc. (7401). The Debtors' headquarters is located at 1550 W Digital Drive, Suite 200, Lehi, UT 84043.

### IMPORTANT INFORMATION REGARDING THIS
### COMBINED DISCLOSURE STATEMENT AND PLAN[2]

> **THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS SUBJECT TO CHANGE.**

**The Debtors are soliciting votes on this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Lumio Holdings, Inc. and Lumio HX, Inc.* from the Holders of Class 3 Prepetition Secured Term Loan Claims:**

**If you are in Class 3, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan.  Before submitting a Ballot to vote on the Plan, you should review this Combined Disclosure Statement and Plan.**

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY <u>RECEIVED</u> BY THE DEBTORS' CLAIMS AGENT, STRETTO, INC., NO LATER THAN JANUARY 27, 2024, AT 5:00 P.M. (PREVAILING EASTERN TIME).  BALLOTS MUST BE SUBMITTED TO THE CLAIMS AGENT ELECTRONICALLY (ON THE CLAIMS AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

**You can vote electronically by visiting the case information website maintained by the Claims Agent, (HTTPS://CASES.STRETTO.COM/LUMIO/) clicking on the "E-Ballot" tab and following the prompts and directions.  You will need your unique E-Ballot ID# to submit your electronic ballot; your E-Ballot ID# can be found on your Ballot.  Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot.  Holders who vote electronically via the Claims Agent's online portal should not also submit a paper Ballot.  The electronic ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the electronic ballot portal.  Ballots delivered by email, facsimile, or any other electronic means may not be counted.**

**If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:**

---

[2]     Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Lumio Holdings, Inc. and Lumio HX, Inc.* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "<u>Disclosure Statement</u>," the "<u>Combined Disclosure Statement and Plan</u>," or the "<u>Plan</u>," as applicable).

| If by First-Class Mail, Hand Delivery or Overnight Mail |
| --- |
| Lumio Holdings, Inc.<br>Ballot Processing Center<br>c/o Stretto, Inc.<br>410 Exchange, Suite 100<br>Irvine, California 92602 |

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

**\*\*\***

## PRELIMINARY STATEMENT AND DISCLAIMERS

The Bankruptcy Court has established **January 27, 2025 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "Combined Disclosure Statement and Plan Objection Deadline"). *See* D.I. [●]. Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and the Solicitation Order, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court no later than the Combined Disclosure Statement and Plan Objection Deadline.

A hearing on the final approval of the Disclosure Statement and the confirmation of the Plan (as such hearing may be continued from time to time, the "Combined Hearing") will commence on **February 3, 2025 at 11:00 a.m. (prevailing Eastern Time)** in the Bankruptcy Court before the Honorable J. Kate Stickles, 5th Floor, Courtroom 6, 824 N. Market St., Wilmington, DE 19801. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of these chapter 11 cases. In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined Disclosure Statement and Plan contains summaries of certain provisions and certain other documents and information. The financial information included herein is provided solely for the purpose of soliciting votes on the Combined Disclosure Statement and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined Disclosure Statement and Plan. While the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined

Disclosure Statement and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined Disclosure Statement and Plan. The Bankruptcy Court's approval or confirmation of the Combined Disclosure Statement and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined Disclosure Statement and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined Disclosure Statement and Plan should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Combined Disclosure Statement and Plan. All Holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting on the Plan. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined Disclosure Statement and Plan (including the documents attached hereto). The Combined Disclosure Statement and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to Holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information has not been audited, except to the extent specifically indicated otherwise herein. The financial information provided has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring after the date on which the financial information was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined Disclosure Statement and Plan, nor any action taken by the Debtors in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or

has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors, or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder of a Claim.

The Combined Disclosure Statement and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined Disclosure Statement and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined Disclosure Statement and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. See Article V for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

This Combined Disclosure Statement and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined Disclosure Statement and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined Disclosure Statement and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

***

## TABLE OF CONTENTS

Page

INTRODUCTION .........................................................................................................1

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ........................2

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED
RECOVERIES ...........................................................................................................17

    2.1     General Rules of Classification ....................................................17
    2.2     Unimpaired Classes of Claims .....................................................20
    2.3     Impaired Classes of Claims ..........................................................20
    2.4     Impaired Class of Equity Interests ...............................................20

ARTICLE III BACKGROUND AND DISCLOSURES ..................................................20

    3.1     General Background ......................................................................20
    3.2     Events Leading to Chapter 11 ......................................................23
    3.3     The Chapter 11 Cases ..................................................................25

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES ................................30

    4.1     Confirmation Procedure.................................................................30
    4.2     Procedure for Objections ..............................................................30
    4.3     Requirements for Confirmation ....................................................30
    4.4     Classification of Claims and Interests ..........................................31
    4.5     Impaired Claims or Interests ........................................................32
    4.6     Confirmation Without Necessary Acceptances; Cramdown ...................32
    4.7     Feasibility.....................................................................................33
    4.8     Best Interests Test and Liquidation Analysis ...............................34
    4.9     Acceptance of the Plan..................................................................35

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING
.................................................................................................................................35

    5.1     The Plan May Not Be Accepted ..................................................36
    5.2     The Plan May Not Be Confirmed .................................................36
    5.3     Distributions to Holders of Allowed Claims under the Plan May Be
            Inconsistent with Projections ......................................................36
    5.4     Objections to Classification of Claims........................................36
    5.5     Failure to Consummate the Plan ..................................................37
    5.6     Allowance of Claims May Substantially Dilute the Recovery to
            Holders of Claims under the Plan ................................................37
    5.7     Plan Releases May Not Be Approved...........................................37
    5.8     Certain Tax Considerations..........................................................38

i

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS...........................................38

6.1    Administrative Claims .................................................................38
6.2    Professional Fee Claims...............................................................39
6.3    Tax Claims ...................................................................................40
6.4    DIP Claims ..................................................................................40

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............41

7.1    Class 1: Other Priority Claims ....................................................41
7.2    Class 2: Other Secured Claims ...................................................41
7.3    Class 3: Prepetition Secured Term Loan Claims ........................41
7.4    Class 4: General Unsecured Claims.............................................41
7.5    Class 5: Subordinated Claims .....................................................42
7.6    Class 6: Equity Interests..............................................................42
7.7    Reservation of Rights Regarding Claims and Interests ..............42

ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN ..............................42

8.1    Classes Entitled to Vote...............................................................42
8.2    Acceptance by Impaired Classes of Claims or Interests.............42
8.3    Presumed Acceptance by Unimpaired Classes ...........................42
8.4    Presumed Rejections by Impaired Classes .................................42
8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........42
8.6    Controversy Concerning Impairment .........................................43
8.7    Elimination of Vacant Classes ....................................................43
8.8    Voting Classes; Deemed Acceptance by Non-Voting Classes .................43

ARTICLE IX MEANS OF IMPLEMENTING THE PLAN..............................................43

9.1    Distributions on the Effective Date/Dissolution of Debtors .....................43
9.2    Liquidating Trust ........................................................................44
9.3    Liquidating Trustee .....................................................................46
9.4    Fees and Expenses .......................................................................49
9.5    Liquidating Trustee as Estate Representative and Successor ...................49
9.6    Distributions................................................................................49
9.7    Corporate Action.........................................................................50
9.8    Directors, Officers, Managers, Members and Authorized Persons of the Debtors ...............................................................................50
9.9    Closing of the Chapter 11 Cases.................................................50
9.10   Committee....................................................................................50
9.11   Effectuating Documents; Further Transactions .........................50
9.12   Release of Liens ..........................................................................51
9.13   Exemption from Certain Transfer Taxes ...................................51
9.14   Setoffs ..........................................................................................51
9.15   Withdrawal of Plan .....................................................................51
9.16   Insurance Preservation ...............................................................51

9.17    D&O Insurance Policies ...................................................................52
9.18    Indemnification of Directors, Officers, and Employees ...........................52
9.19    Withholding and Reporting Requirements. ...........................................52
9.20    Cancellation of Existing Interests, Securities and Agreements
        (Including Cancellation of any Authorized but Unissued Shares)............53

ARTICLE X EFFECT OF PLAN ON CLAIMS AND INTERESTS ...............................54

10.1    Binding Effect.................................................................................54
10.2    Treatment of Claims ........................................................................54
10.3    No Discharge of the Debtors...............................................................54
10.4    Injunction ......................................................................................55
10.5    Exculpation ....................................................................................55
10.6    Releases by the Debtors ....................................................................56
10.7    Releases by Creditors........................................................................57
10.8    Extinguishment of Intercompany Claims ...............................................57
10.9    Terms of Injunctions or Stays .............................................................58

ARTICLE XI EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................58

11.1    Executory Contracts and Unexpired Leases Deemed Rejected................58
11.2    Claims Based on Rejection of Executory Contracts and Unexpired
        Leases............................................................................................58
11.3    Cure of Defaults for Assumed Executory Contracts and Unexpired
        Leases............................................................................................58
11.4    Modifications, Amendments, Supplements, Restatements or Other
        Agreements .....................................................................................59
11.5    Reservation of Rights.........................................................................59

ARTICLE XII DISTRIBUTIONS ........................................................................60

12.1    Distribution Record Date ...................................................................60
12.2    Delivery of Distributions and Undeliverable or Unclaimed
        Distributions....................................................................................60
12.3    Interest on Claims ............................................................................61
12.4    Withholding and Reporting Requirements .............................................61
12.5    Miscellaneous Distribution Provisions ..................................................62
12.6    De Minimis Distribution Provisions ......................................................62
12.7    Residual Assets ...............................................................................62

ARTICLE XIII...................................................................................................62

13.1    Objections to Claims..........................................................................62
13.2    Estimation of Claims..........................................................................62
13.3    Disputed Claims Reserve ....................................................................63
13.4    No Distribution Pending Allowance .......................................................63
13.5    Resolution of Claims..........................................................................63
13.6    Amendments to Late Filed Claims .........................................................63

13.7     Insured Claims ...........................................................................................64

ARTICLE XIV CONFIRMATION AND CONSUMMATION OF THE PLAN............64

14.1     Conditions to Confirmation ......................................................................64
14.2     Conditions to Effective Date.....................................................................64
14.3     Consequences of Non-Occurrence of Effective Date ...............................65
14.4     Substantial Consummation .......................................................................65
14.5     Effect of Vacatur of Confirmation Order..................................................65

ARTICLE XV ADMINISTRATIVE PROVISIONS .......................................................65

15.1     Retention of Jurisdiction ..........................................................................65
15.2     Amendments .............................................................................................67
15.3     Successors and Assigns.............................................................................68
15.4     Governing Law .........................................................................................68
15.5     Corporate Action......................................................................................68
15.6     Effectuating Documents and Further Transactions....................................68
15.7     Confirmation Order and Plan Control.......................................................68
15.8     Miscellaneous Rules .................................................................................68
15.9     Notices .....................................................................................................68
15.10    No Admissions or Waiver.........................................................................69

## INTRODUCTION

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[3] the Debtors propose this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Lumio Holdings, Inc. and Lumio HX, Inc.*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Combined Hearing to consider confirmation thereof. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan; such items have been or may be filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XV, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the chapter 11 cases. In addition, this Combined Disclosure Statement and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the way Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order approving on an interim basis the Disclosure Statement contained in this Combined Disclosure Statement and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code (D.I. [●]) (the "Solicitation Order"). Entry of the Solicitation Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Combined Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. The**

---

[3]   Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

**Debtors believe that confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Plan provides for an equitable Distribution to Holders of Claims and the compromise and settlement of certain Claims and controversies among the Debtors and their key stakeholders.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of significant value (and a corresponding reduction in the Distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs.  Consequently, the Debtors urge all eligible Holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims Agent on or before the Voting Deadline.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1    "503(b)(9) Claims" means Claims arising under section 503(b)(9) of the Bankruptcy Code Filed against any of the Debtors on or before the Bar Date.

1.2    "Adequate Protection Claims" has the meaning set forth in the Final DIP Order.

1.3    "Administrative Claim" means an unsecured Claim, including a Professional Fee Claim and U.S. Trustee Fees, for payment of costs or expenses of administration specified in sections 503(b) and 507(a) of the Bankruptcy Code, including the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries, or commissions for services rendered).

1.4    "Administrative Claims Bar Date" means the first Business Day that is forty-five (45) days following the Effective Date.

1.5    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.6    "Allowed" means, with respect to a Claim in a specified Class or an Allowed Administrative Claim, Tax Claim, or Professional Fee Claim, such Claim is: (a) either (i) scheduled by the Debtors in their Schedules of assets and liabilities in a liquidated amount and not scheduled as contingent or disputed and not superseded by a proof of claim or subject to setoff; or (ii) asserted in the chapter 11 cases by a proof of claim which has been timely filed, or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules or any applicable order of the Bankruptcy Court, or late filed with leave of Court; and (b) either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a Final Order or pursuant to this Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires; and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of this Plan.  For the avoidance of doubt, a Proof of Claim filed after the Claims Bar

2

Date or a request for payment of an Administrative Claim required to be filed under Article VI filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allowed," "Allow," "Allowance" and "Allowing" shall have correlative meanings.

      1.7    "Approved Budget" shall have the meaning ascribed to it in the Final DIP Order.

      1.8    "Assets" means all of the Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

      1.9    "Asset Purchase Agreement" shall mean the Asset Purchase Agreement, by and among Zeo Energy Corp., as Purchaser, and Lumio Holdings, Inc., and the direct and indirect subsidiaries of Lumio Holdings, as Sellers, dated October 25, 2024, including all schedules and exhibits thereto, and any further amendments entered into from time to time.

      1.10    "Assumed Executory Contracts and Unexpired Leases Schedule" means the list of assumed Executory Contracts and Unexpired Leases filed as an exhibit to the Plan Supplement, which may be supplemented or modified from time to time.

      1.11    "Avoidance Actions" means all Causes of Action of the Estates that arise under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code.

      1.12    "Ballot" means the form approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan and, to the extent desired by the voting Claim Holder, an election to opt out of the Plan's third party releases described in section 10.7 of this Plan.

      1.13    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these chapter 11 cases.

      1.14    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

      1.15    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules of the Bankruptcy Court, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these chapter 11 cases.

      1.16    "Bar Date" means, with respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest, against the Debtors in these chapter 11 cases for the applicable Claim or Interest.

1.17 "Bar Date Motion" means the *Debtors' Motion for Entry of an Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, and (II) Granting Related Relief, Including Notice and Filing Procedures* (D.I. 193).

1.18 "Bar Date Order" means the *Order (I) Establishing Certain Bar Dates for Filing Prepetition Claims and Administrative Expense Claims, and (II) Granting Related Relief, Including Notice and Filing Procedures* (D.I. 318), entered by the Bankruptcy Court on November 6, 2024.

1.19 "Bidding Procedures Order" means the *Order Approving (I) the Debtors' Entry Into Stalking Horse Agreement, (II) the Bidding Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets, (III) the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (V) Dates for an Auction and Sale Hearing and (VI) Granting Related Relief* (D.I. 139), entered by the Bankruptcy Court on September 25, 2024.

1.20 "Business Day" means any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.21 "Cash" means legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.22 "Causes of Action" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law.  For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Equity Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.23 "Claim" means a claim against any Debtor or Debtors for a (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.24 "Claims Agent" means the Debtors' claims agent, Stretto, Inc.

1.25    "Claims Objection Deadline" means one (1) year after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided*, *however*, that the Liquidating Trustee may seek extensions of this date from the Bankruptcy Court and to the extent a motion is filed prior to the expiration of the Claims Objection Deadline (as may be extended by the Bankruptcy Court) seeking any such extensions of this date, the Claims Objection Deadline shall be automatically extended until the Bankruptcy Court rules on such motion.

1.26    "Class" means a group of Claims or Interests described in Article II of this Plan.

1.27    "Committee" means the official committee of unsecured creditors appointed by the U.S. Trustee in these chapter 11 cases (D.I. 93), pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

1.28    "Confirmation Date" means the date the Bankruptcy Court enters the Confirmation Order on the docket of these chapter 11 cases.

1.29    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.30    "Consummation" means the occurrence of the Effective Date of the Plan.

1.31    "CRO" means Jeffrey T. Varsalone, the Chief Restructuring Officer of the Debtors.

1.32    "D&Os" means all current and former directors, managers, members, officers, and employees of the Debtors, including the CRO.

1.33    "D&O Insurance Policies" means all insurance policies (including but not limited to any "tail policy") issued or providing coverage for liabilities against any of the Debtors' D&Os, and all agreements, documents or instruments relating thereto.

1.34    "Debtors" means Lumio Holdings, Inc. and Lumio HX, Inc.

1.35    "DIP Claims" means Claims arising under or related to the DIP Credit Agreement and pursuant to the Final DIP Order.

1.36    "DIP Credit Agreement" means that certain Superpriority Senior Secured Debtor-in-Possession Loan Agreement, entered into by the Debtors and White Oak, as the same may be modified, amended, or supplemented from time to time, in accordance with the terms thereof, and attached to the Interim DIP Order as Exhibit 1.

1.37    "DIP Financing Facility" means the loan facility provided to the Debtors pursuant to the terms of the DIP Credit Agreement authorized by the Final DIP Order.

1.38    "DIP Lender" means White Oak Global Advisors, LLC.

1.39    "DIP Secured Parties" means White Oak Global Advisors, LLC as administrative agent and DIP Lender.

1.40    "Disallowed" means with respect to any Claim or portion thereof, any Claim against any of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) if listed in the Schedules as zero or as disputed, contingent, partially liquidated or unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim or proof of Interest; (v) was not timely or properly Filed; (vi) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; (vii) has been (x) paid or required to be paid by a purchaser pursuant to a Bankruptcy Court-approved purchase agreement or order approving a sale of certain of the Debtors' assets during the course of these chapter 11 cases (including the Sale Order and Asset Purchase Agreement), except as expressly set forth in the Sale Order, or (y) listed in the Schedules in an amount greater than zero and as non-contingent, liquidated and undisputed and been paid by the Debtors (a) after the Petition Date pursuant to an order of the Bankruptcy Court or (b) before the Petition Date and was inadvertently listed in the Schedules, and with respect to such Claim, a notice of satisfaction of Claim has been filed or will be filed prior to the Claims Objection Deadline with respect to such Claim and the Holder of such Claim fails to object to or respond to such notice of satisfaction; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.  In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, satisfaction, expungement, subordination, or estimation.

1.41    "Disputed Claim" means any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.  For the purposes of this Plan, a Claim shall be considered a Disputed Claim in its entirety before the time that an objection has been or may be filed if: (a) the amount or classification of the Claim specified in a relevant Proof of Claim exceeds the amount or classification of any corresponding Claim scheduled in the Debtors' Schedules of assets and liabilities; (b) any corresponding Claim scheduled by the Debtors has been scheduled as disputed, contingent or unliquidated; or (c) no corresponding Claim has been scheduled by the Debtors in their Schedules of assets and liabilities.

1.42    "Disputed Claims Reserve" means Liquidating Trust Assets allocable to Disputed Claims.

1.43    "Distribution" means the distribution of Cash or other property, as the case may be, in accordance with this Plan in respect of the Holders of Allowed Claims.

1.44    "Distribution Address" means the address for a Holder set forth in a Proof of Claim, as amended or supplemented.  If no Proof of Claim is filed with respect to a

particular Claim, such defined term means the address for the Holder set forth in the Debtors' Schedules.

1.45    "Distribution Date" means the date determined by the Liquidating Trustee when Distributions will be made under the Plan.

1.46    "Distribution Record Date" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which shall be the Confirmation Date.

1.47    "Effective Date" means, with respect to each Debtor, the date that the Plan becomes effective, which shall be after all the conditions specified in Section 14.2 of the Plan have been satisfied or waived (to the extent waivable).

1.48    "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.49    "Equity Interest" means (i) any outstanding ownership interest in any of the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation, and (ii) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

1.50    "Estate" or "Estates" means individually or collectively, the estate of each Debtor created under section 541 of the Bankruptcy Code on the Petition Date.

1.51    "Exculpated Parties" means the following, to the extent permitted by applicable law, in their capacity as such: (a) the Debtors; (b) the current and former directors and officers of the Debtors who served at any time between the Petition Date and the Effective Date; (c) Morris Nichols, as counsel to the Debtors; (d) Houlihan, as investment banker to the Debtors; (e) Stretto, as administrative advisor to the Debtors; (f) Porzio, as counsel to the Committee; (g) Province, as investment banker to the Committee; (h) the Committee and its members; (i) the CRO; (j) VRS Restructuring Services, LLC; and (k) the Related Parties for each Entity in clauses (c) through (j) of the foregoing to the extent they are estate fiduciaries.

1.52    "Executory Contract" means a contract to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.53    "Fee Application" means an application for allowance and payment of a Professional Fee Claim.

1.54    "Fiera" means Fiera Comox Private Credit Opportunities Open-End Fund L.P. (along with its affiliates).

1.55     "File," "Filed," or "Filing" means, respectively, file, filed, or filing with the Bankruptcy Court or Stretto in these chapter 11 cases.

1.56     "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided*, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

1.57     "Final DIP Order" means *the Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Term Loan Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (D.I. 194), entered by the Bankruptcy Court on October 2, 2024.

1.58     "First Day Declaration" means the *Declaration of Jeffrey T. Varsalone in Support of Chapter 11 Petitions and First Day Relief* (D.I. 15).

1.59     "First Tier Claims" means, collectively, all Allowed Administrative Claims, Other Priority Claims, Tax Claims, and the U.S. Trustee Fees.

1.60     "First Tier Claims Reserve" means a reserve established on the Effective Date solely from the Sale Proceeds sufficient to fund the First Tier Claims that are not paid on the Effective Date.

1.61     "General Unsecured Claim" means any unsecured nonpriority Claim against the Debtors, other than Intercompany Claims or Subordinated Claims. General Unsecured Claims shall not include Claims that are not Allowed or are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

1.62     "Governmental Unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

1.63     "Governmental Bar Date" means March 3, 2025, as the deadline by which a Governmental Unit must file a proof of claim in respect of a prepetition claim against the Debtors.

1.64    "GUC Recovery" means after payment to White Oak of the White Oak Liquidating Trust Fee Reimbursement, (i) thirty percent (30%) of the first $5,000,000 in distributable proceeds from the Unsold Claim Assets and (ii) ten percent (10%) of any additional distributable proceeds from the Unsold Claim Assets exceeding the initial $5,000,000.

1.65    "Holder" or "Holders" means a Person or an Entity holding a Claim or Interest.

1.66    "Houlihan" means Houlihan Lokey Capital, Inc.

1.67    "Impaired Class" means a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.68    "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.69    "Insurance Policies" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or proceeds to any of the Debtors and all agreements, documents, or instruments relating thereto, including the D&O Insurance Policies.

1.70    "Insurer" means any company or other entity that issued an Insurance Policy, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

1.71    "Intercompany Claims" means any Claim held by a Debtor against the other Debtor or any Interest held by a Debtor in the other Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to the other Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against the other Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against the other Debtor.

1.72    "Interim Approval and Procedures Order" means the *Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballots and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief* (D.I. ●), entered by the Bankruptcy Court on [●], 2025.

1.73    "Interim Compensation Procedures Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* (D.I. 170), entered by the Bankruptcy Court on September 30, 2024.

1.74    "Interim DIP Order" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Term Loan Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (D.I. 58), entered by the Bankruptcy Court on September 4, 2024.

1.75　　"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.76　　"IRS" means the United States Internal Revenue Service.

1.77　　"Lien" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.78　　"Liquidating Trust" means the trust to be created pursuant to Article IX of the Plan on the Effective Date for the benefit of the Holders of Allowed Claims.

1.79　　"Liquidating Trust Agreement" means the trust agreement, in form and substance reasonably acceptable to the Debtors, White Oak, and the Committee to be filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the Liquidating Trust; (b) set forth the respective powers, duties and responsibilities of the Liquidating Trustee; and (c) provide for Distributions to Holders of Allowed Claims in accordance with Article XII hereof.

1.80　　"Liquidating Trust Assets" means (i) all Cash held by the Debtors as of the Effective Date, excluding amounts held in trust with respect to the Professional Fee Account, (ii) the First Tier Claims Reserve, (iii) the Unsold Claim Assets, and (iv) Other Unsold Assets, all of which are being transferred pursuant to this Plan to the Liquidating Trust upon the Effective Date.

1.81　　"Liquidating Trust Expenses" means any and all reasonable fees, costs and expenses incurred by the Liquidating Trust or the Liquidating Trustee (or any professional or other Person retained by the Liquidating Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidating Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

1.82　　"Liquidating Trustee" means an individual, to be identified in the Plan Supplement, who will be appointed and acceptable to White Oak and the Committee as of the Effective Date as trustee of the Liquidating Trust and shall be responsible for the duties, powers, and affairs of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

1.83　　"Liquidating Trustee Professionals" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Liquidating Trustee (in their capacities as such).

1.84　　"Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.85　　"Lumio" means Debtor Lumio HX, Inc. and Debtor Lumio Holdings, Inc.

1.86　　"Lumio HX" means Debtor Lumio HX, Inc.

1.87    "Lumio Holdings" means Debtor Lumio Holdings, Inc.

1.88    "Morris Nichols" means Morris, Nichols, Arsht & Tunnell LLP, as counsel to the Debtors.

1.89    "Other Priority Claim" means any Claim entitled to priority under section 507(a) of the Bankruptcy Code that is not a Tax Claim.

1.90    "Other Secured Claim" means a Claim, other than a Prepetition Secured Claim, that is: (a) secured by a valid and perfected Lien on property in which an Estate has an interest, but only to the extent of the value of the Holder's interest in the applicable Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the amount subject to setoff, as determined pursuant to section 553 of the Bankruptcy Code.

1.91    "Other Unsold Assets" means Assets not sold pursuant to the Sale, other than the Unsold Claim Assets, to include all letters of credit, bonds, and the proceeds from the foregoing.

1.92    "Other Unsold Assets Proceeds" means all proceeds of Other Unsold Assets.

1.93    "Person" is defined in section 101(41) of the Bankruptcy Code.

1.94    "Petition Date" means September 3, 2024, the date the Debtors commenced their chapter 11 cases in the Bankruptcy Court.

1.95    "Plan Documents" means the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the Consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and all exhibits to the Plan and the Disclosure Statement.

1.96    "Plan Supplement" means the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things: (a) draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases, if any; and (c) any schedules, lists or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.97    "Porzio" shall mean Porzio, Bromberg & Newman, P.C. in its capacity as counsel to the Committee.

1.98    "Prepetition Secured Term Loans" means the Incremental Term Loans and Protective Advances (both as defined in the Prepetition Secured Term Loan Credit Agreement) issued pursuant to the Prepetition Secured Term Loan Credit Agreement.

1.99    "Prepetition Secured Term Loan Agent" means White Oak (as successor to HSBC Bank USA, National Association), as administrative agent under the Prepetition Secured Term Loan Credit Agreement.

1.100    "Prepetition Secured Term Loan Claims" shall mean any and all Claims derived from, based upon, relating to, or arising from the Prepetition Secured Term Loan Credit Agreement, whether such claims are secured or unsecured. The Prepetition Secured Term Loan Claims shall not include the Adequate Protection Claims, which shall be waived upon the occurrence of the Effective Date.

1.101    "Prepetition Secured Term Loan Claims Distribution Amount" means after payment to White Oak of the White Oak Liquidating Trust Fee Reimbursement, (i) seventy percent (70%) of the first $5,000,000 in distributable proceeds of the Unsold Claim Assets and (ii) ninety percent (90%) of any additional distributable proceeds exceeding the initial $5,000,000.

1.102    "Prepetition Secured Term Loan Credit Agreement" means that certain Senior Secured Credit Agreement, dated as of December 10, 2021, by and among (i) the Debtors, (ii) the lenders party thereto from time to time, including Fiera, (iii) White Oak, as lender representative, and (iv) the Prepetition Secured Term Loan Agent.

1.103    "Prepetition Term Loan Secured Parties" means the Lenders (as defined in the Prepetition Secured Term Loan Credit Agreement) from time to time party thereto and White Oak Global Advisors, LLC, as lender representative and (as successor to HSBC Bank USA, National Association) as administrative agent.

1.104    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.105    "Professional" or collectively "Professionals," means any professional Person or Entity employed in these chapter 11 cases by Bankruptcy Court order pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

1.106    "Professional Fee Account" means the professional fee escrow account created pursuant to the Final DIP Order and funded pursuant thereto and the Approved Budget for the purpose of payment of Allowed Professional Fee Claims.  For the avoidance of doubt, the Professional Fee Account, and all funds held therein, are (and shall be deemed) held in trust exclusively for the benefit of the Professionals and shall be available only to satisfy Professional Fee Claims (to the extent unpaid). Any remaining funds in the Professional Fee Account from and after final allowance and payment in full of all Professional Fee Claims shall revert to the Estates and/or the Liquidating Trust and be deemed Liquidating Trust Assets.

1.107    "Professional Fee Claims" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the chapter 11 cases, subject to the Professional Fee Cap set forth in the Settlement Term Sheet.  "Professional Fee Claim" does not include any Claim for

compensation or reimbursement of expenses related to services rendered after the Effective Date by the Liquidating Trustee Professionals.

1.108   "Proof of Claim" means a proof of Claim filed against any of the Debtors in these chapter 11 cases.

1.109   "Province" shall mean Province, LLC as financial advisor to the Committee.

1.110   "Purchaser" means Zeo Energy Corp. as "Purchaser" under the certain Asset Purchase Agreement, dated October 25, 2024.

1.111   "Related Parties" means collectively with respect to any Person, such Person's current and former affiliates, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, managed accounts or funds, advisors, employees, agents, attorneys, and other representatives, each in their capacities as such.

1.112   "Released Party" means collectively, (i) the current directors, officers, employees, agents, representatives, advisors, attorneys, investment bankers and financial advisors of the Debtors, (ii) the CRO, (iii) VRS Restructuring Services, LLC, (iv) Morris Nichols, as counsel to the Debtors, (v) Houlihan, as investment banker to the Debtors (vi) the Prepetition Term Loan Secured Parties, including, without limitation, White Oak, (vii) the DIP Secured Parties, including, without limitation, White Oak, (viii) Porzio, as counsel to the Committee, (ix) members of the Committee, (x) Province, as financial advisor to the Committee, and (xi) the respective Related Parties for each of the foregoing to the extent such parties are or were acting in such capacity of or for any of the Persons identified in (i) through (x) above.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) any predecessor of any Debtor or their subsidiaries, (ii) any former D&O of the Debtors, and (iii) Zeo, in each case, are not and shall not be deemed hereunder a Released Party.

1.113   "Releasing Parties" means (a) all Holders of Claims or Equity Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures, (b) each Released Party, and (c) with respect to any Person or Entity in the foregoing clauses (a) and (b), the Related Party of such Person or Entity solely in their capacity as such (provided that with respect to any Related Party identified herein, each such Person constitutes a Releasing Party under this clause solely with respect to derivative claims that such Related Party could have properly asserted on behalf of a Person identified in clauses (a) and (b) of the definition of Releasing Parties).

1.114   "Remaining First Tier Claims Reserve" means any portion of the First Tier Claims Reserve after payment of, or reserve in full for all Allowed Administrative Claims, Allowed Other Priority Claims, Allowed Tax Claims, and the U.S. Trustee Fees.

1.115   "Sale" means the sale of the Debtors' assets to the Purchaser pursuant to the Sale Order.

1.116    "Sale Motion" means the *Debtors' Motion for Entry of an Order Approving (I)(A) the Debtors' Entry Into Stalking Horse Agreement and Related Expense Reimbursement; (B) the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (C) the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (E) Dates for an Auction and Sale Hearing; (II)(A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests, and Encumbrances and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (D.I. 18).

1.117    "Sale Order" means the *Order (I) Approving the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Approving the Assumption and Assignment of Certain executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (D.I. 305), entered by the Bankruptcy Court on November 1, 2024.

1.118    "Sale Proceeds" means $3.4 million of cash proceeds of the Sale.

1.119    "Schedules" mean the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.120    "Settlement Term Sheet" means that certain Settlement Term Sheet entered into by and among the Debtors, White Oak, and the Committee, and attached as Exhibit B to the Sale Order.

1.121    "Solicitation Materials" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

1.122    "Solicitation Procedures" means the procedures approved by the Interim Approval and Procedures Order by which the Debtors (i) solicit votes to accept or reject the Plan and (ii) obtain releases by the Releasing Parties in favor of the Released Parties.

1.123    "Stalking Horse Agreement" means that certain asset purchase agreement between the Debtors, as sellers, and LHX Home Services, LLC, as purchaser, for sale of the Debtors' assets.

1.124    "Subordinated Claim" means any Claim subject to subordination, whether pursuant to a Final Order of the Bankruptcy Court under section 510 of the Bankruptcy Code or by written consent of the Holder of such Claim, whether such Final Order is entered or such consent is given prior to or following the Effective Date.

1.125    "Tax Claim" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.126    "Unclaimed Distributions" mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for uncashed checks, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to section 12.2 of this Plan.

1.127    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.128    "Unimpaired" means, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.129    "Unsold Claim Assets" means all claims and Causes of Actions of the Debtors and their Estates that have not been purchased as set forth in the Sale Order, or otherwise waived, released, compromised, or settled pursuant to this Plan or Bankruptcy Court order, which shall include all rights, claims and Causes of Action of the Debtors or any of their respective subsidiaries: (a) against any of their respective predecessors, (b) against any former directors or former officers of the Debtors, and (c) arising under or relating to any asset purchase agreement, share purchase agreement, merger agreement or similar agreement (or ancillary agreement entered into thereunder), excluding the Stalking Horse Agreement.  For the avoidance of doubt, the Unsold Claim Assets include all claims and Causes of Action of the Debtors or their Estates in connection with any acquisition transactions consummated in 2021 and 2022, including, without limitation, all breach of representation, warranty and other claims related to non-competition, non-solicitation, or other related obligations.  To the extent that any of these claims and Causes of Action are personal to White Oak (in any of its capacities), White Oak shall be deemed to have assigned such claims and Causes of Action to the Liquidating Trust.

1.130    "Unsold Claims Assets Liquidating Trust Expenses" means reasonable and documented expenses incurred by the Liquidating Trust in pursuing recoveries from the Unsold Claims Assets in an amount not to exceed [$___].

1.131    "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

1.132    "U.S. Trustee Fees" mean fees payable pursuant to 28 U.S.C. § 1930, to the extent applicable to these chapter 11 cases.

1.133    "Voting Class" means a Class whose members are entitled to vote on this Plan.

1.134    "Voting Deadline" shall mean **January 27, 2025 at 4:00 p.m. (prevailing Eastern Time)**, the date specified in the Disclosure Statement, the Ballots, the Opt-Out Election Form, the Interim Approval and Procedures Order or related Solicitation Materials

approved by the Bankruptcy Court as the last date for Holders of Claims entitled to vote on this Plan to submit their ballots with respect to this Plan, as such date may be extended.

1.135    "White Oak" means White Oak Global Advisors, LLC.

1.136    "White Oak Liquidating Trust Fee Reimbursement" means an amount equal to 110% of the Unsold Claims Assets Liquidating Trust Expenses.

1.137    "Wind-Down Estates" means the Estates of the Debtors after the Effective Date.

1.138    "Zeo" means Zeo Energy Corp.

**Rules of Interpretation**

1.139    Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise.  The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Any term that is not otherwise defined herein but used in the Bankruptcy Code or the Bankruptcy Rules, is used as defined in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.140    Any reference in this Plan to a contract, instrument, release, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

1.141    The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any entity as a holder of a Claim or Interest includes that entity's successors and assigns.

1.142    In the event of an inconsistency between the Plan and any other document other than the Confirmation Order or the Liquidating Trust Agreement, the terms of the Plan shall control (unless expressly stated otherwise herein or in such other document).  The provisions of the Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order or the Liquidating Trust Agreement that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order or the Liquidating Trust Agreement, as

applicable, shall govern and any such provision of the Confirmation Order or the Liquidating Trust Agreement, as applicable, shall be deemed a modification of the Plan and shall control and take precedence. In the event of an inconsistency between the Confirmation Order and the Liquidating Trust Agreement, the terms of the Confirmation Order shall govern solely to the extent of such inconsistency.

**Appendices and Plan Documents**

1.143    All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Copies of the Plan Documents are available free of charge https://cases.stretto.com/lumio/ or at www.deb.uscourts.gov, or by contacting the Claims Agent via email at LumioInquiries@stretto.com; or by phone at (855) 328-2638 (Domestic) or (714) 203-6409 (International).

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

2.1    **General Rules of Classification**. The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making Distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. The Plan is not premised upon and will not cause the substantive consolidation of any of the Debtors, but the Debtors reserve the right to seek, in connection with Confirmation of the Plan, substantive consolidation of the Debtors. A Holder of a Claim against more than one Debtor on a theory of joint and several liability shall only be entitled to a single recovery in Distribution. For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one table set below in this section. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and the actual Distributions received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates. The

Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class, and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims and Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article II of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 1**: Other Priority Claims | Each Holder of an Allowed Class 1 Claim shall receive Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim. | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | 100% | $223,100.00 |
| **Class 2**: Other Secured Claims | Each Holder of an Allowed Class 2 Claim shall receive, at the option of the Debtors, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) receive its collateral in full satisfaction of its Claim; or (iii) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired. | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | 100% | $131,000.00 |

18

| Class/ Designation | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 3**: Prepetition Secured Term Loan Claims | Each Holder of an Allowed Prepetition Secured Term Loan Claim shall be entitled to receive its Pro Rata Share of the Prepetition Secured Term Loan Claims Distribution Amount. For the avoidance of doubt, Holders of Claims in Class 3 shall not share in the GUC Recovery. | Impaired<br><br>Entitled to vote | Unknown | $248,390,182.23 |
| **Class 4:** General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of and in exchange for its Allowed Class 4 Claim, its Pro Rata share of the GUC Recovery. | Impaired<br><br>Not Entitled to vote<br><br>Deemed to reject Plan | Unknown | $24,400,000.00 – $111,919,292.02 |
| **Class 5**: Subordinated Claims | Each Holder of an Allowed Class 5 Claim shall receive no Distribution on account of their Subordinated Claims. | Impaired<br><br>Not entitled to vote<br><br>Deemed to reject Plan | 0% | $0 |
| **Class 6:** Equity Interests | On the Effective Date, all Equity Interests shall be deemed canceled, extinguished, and discharged and of no further force or effect, and the Holders of Equity Interests shall not be entitled to receive or retain any property on account of such Interests. | Impaired<br><br>Not entitled to vote<br><br>Deemed to reject Plan | 0% | N/A |

**2.2     Unimpaired Classes of Claims**.

**Class 1: Other Priority Claims.**  Class 1 shall consist of Other Priority Claims against the Debtors.  Class 1 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**Class 2: Other Secured Claims.**  Class 2 shall consist of Other Secured Claims against the Debtors.  Class 2 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 2 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**2.3     Impaired Classes of Claims**.

**Class 3: Prepetition Secured Term Loan Claims.** Class 3 shall consist of the Prepetition Secured Term Loan Claims.  The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims.**  Class 4 shall consist of all Allowed General Unsecured Claims against the Debtors.  The Class 4 Claims are Impaired by the Plan and are deemed to reject the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.

**Class 5: Subordinated Claims.**  Class 5 shall consist of all Subordinated Claims.  Because Holders of Class 5 Subordinated Claims will receive no Distribution under the Plan, Holders of Class 5 Subordinated Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

**2.4     Impaired Class of Equity Interests**.

**Class 6: Equity Interests.**  Class 6 shall consist of all Equity Interests.  Because Holders of Class 6 Equity Interests will receive no Distribution under the Plan, Holders of Class 6 Equity Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

### ARTICLE III
### BACKGROUND AND DISCLOSURES

**3.1     General Background.**[4]

(a)     *The Debtors' Business.*

Lumio was founded in December 2021 with the strategic combination of four regional residential solar installation businesses.  Lumio was a leader in personalized renewable energy, delivering top-tier residential solar solutions to its customers across the nation. Lumio was the largest privately held residential solar provider that was fully vertically integrated with a full suite of photovoltaic solar system sales, installation and operations.  Lumio's fully integrated model allowed it to control every interaction with its customers to ensure superior service.  Indeed,

---

[4]     Further information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the chapter 11 cases is set forth in detail in the First Day Declaration, which is incorporated by reference herein.

Lumio focused on superior customer service to capture the customer relationship and remain invested in its customers post-installation, which set Lumio apart from its competitors.

Lumio was a national company with its primary market being the southern United States. Lumio maintained an overwhelming market share in these regions and boasted a phenomenal market reputation. Lumio was also exploring additional markets as it sought to grow further. As a national company, Lumio was able to set itself apart from its competitors through its strong buying power.

(b)     *The Debtors' Prepetition Corporate Structure*

The following chart depicts the relationship among the Debtors (highlighted in blue) and their non-Debtor affiliates, which have either no or *de minimis assets*:



(c)     *The Debtors' Prepetition Capital Structure.*

As of the Petition Date, Lumio had approximately $300 million in principal amount of total debt obligations.

***i.     Prepetition Loan Agreement***

Each of the Debtors is party to the Prepetition Secured Term Loan Credit Agreement, by and among (i) Lumio HX, as borrower, (ii) Lumio Holdings, as guarantor, (iii) the lenders party thereto from time to time, including Fiera, (iv) White Oak, as lender representative, and (v) White Oak (as successor to HSBC Bank USA, National Association), as administrative agent. The Prepetition Secured Term Loan Credit Agreement provided for a term loan facility with additional funds that could be lent through the Prepetition Secured Term Loans.

As of the Petition Date, the principal amount of outstanding Prepetition Secured Term Loans was not less than $248,390,182.23 and was comprised of (i) $60,251,739.95 of outstanding Term Loans (as defined in the Prepetition Secured Term Loan Credit Agreement) and (ii) $188,138,442.28 of outstanding Protective Advances (as defined in the Prepetition Secured Term Loan Credit Agreement) issued pursuant to the prepetition amendments to the Prepetition Secured Term Loan Credit Agreement. White Oak was the sole provider of twelve Protective

Advances provided to the Debtors on an approximately monthly basis for nine months prior to the Petition Date, ranging from $2 million to $15 million for each Protective Advance. In exchange for White Oak's commitment, certain Prepetition Secured Term Loans were automatically substituted and exchanged for and were deemed to constitute Protective Advances pursuant to each of Amendment No. 16 through Amendment No. 24 to the Prepetition Secured Term Loan Credit Agreement, in an aggregate amount of $69,000,000. The Prepetition Secured Term Loans were secured on a first-priority basis by liens on substantially all of the Assets of the Debtors (subject to customary exceptions).

### ii.    *Subordinated Promissory Note*

Lumio HX was party to that certain unsecured promissory note, dated as of January 27, 2023 (the "Promissory Note"), with Slim Ventures, LLC. The total principal amount of the Promissory Note was $5,000,000, all of which remained outstanding, plus interest as of the Petition Date. The Promissory Note was subordinated to the Prepetition Loan Facility and payment was governed pursuant to that certain Subordination Agreement, by and between White Oak, as administrative agent and lender representative under the Prepetition Loan Agreement, and Slim Ventures, LLC, as lender under the Promissory Note.

### iii.    *FinCos*

Customers of the Debtors who wished to purchase their solar panels could finance their purchase through the FinCos, who provide financing services on behalf of the Debtors. Pursuant to the Debtors' agreements with three of its FinCos—(i) Sunnova Energy Corporation ("Sunnova"), (ii) Solar Mosaic, LLC ("Mosaic"), and (iii) Palmetto Solar, LLC ("Palmetto")—the Debtors received "prebates" from each of the FinCos. The prebates were advances of funds that the Debtors used in the operation of their business and installation of solar panels. In exchange, the Debtors were required to satisfy certain sale volume requirements that required customer financing from the FinCos. If the Debtors did not satisfy their volume requirements, the FinCos were entitled to repayment of a portion of the prebates.

Separate from the prebates, when a customer entered into a financing agreement with one of the FinCos, that FinCo advanced the Debtors an upfront payment (the "Prepayment"), which the Debtors used to purchase materials necessary for the installation. On average, thirty percent of these agreements failed to proceed through to installation. When this occurred, the FinCos could "claw back" the Prepayments from the Debtors. On average, the FinCos clawed back approximately $500,000 each month in Prepayments.

### iv.        Trade and Other Unsecured Debt

The Debtors estimate that, as of the Petition Date, they had approximately $35,000,000 in unpaid trade and other unsecured obligations.[5]

### v.        Equity

Debtor Lumio HX, Inc. is 100% owned by Lumio Holdings, Inc.  Lumio Holdings, Inc. is a private company that has 31,122,573 shares of common stock issued and outstanding as of August 30, 2024.  All of the common stock is held by individuals who are current and former employees of the Debtors.  In addition, Lumio Holdings has issued stock options and warrants for a total of 13,820,322 shares of common stock.

### 3.2      Events Leading to Chapter 11.

Despite the positive long-term growth trajectory in the residential solar sector, Lumio faced a severe liquidity crisis over the year prior to the Petition Date which was caused by a sharp decline in demand in the solar market and various macroeconomic headwinds. Specifically, increases in U.S. inflation and corresponding increases in interest rates led to reduced demand across the entire solar power industry and hindered Lumio's financial performance.  In addition, a shifting regulatory landscape in key markets created uncertainty and pressured margins across the sector.  The reduced demand and revenue caused Lumio's liquidity to deteriorate.

Throughout 2024, Lumio and its advisors actively pursued various alternatives to address Lumio's liquidity challenges.  Among other things, Lumio undertook extensive cost-cutting measures while exploring strategic avenues for growth to increase revenue.  In the months leading up to the Petition Date, Lumio's refreshed leadership team took deliberate action to strategically and operationally reorganize the business to meet its needs and establish a foundation to support growth.

Critical to Lumio's turnaround strategy was the support of its prepetition secured lenders, led by White Oak as administrative agent and lender representative for the Debtors' prepetition secured term loan facility.  White Oak consistently demonstrated its commitment to Lumio and its growth by working with Lumio's management to ensure Lumio had sufficient liquidity to operate and pursue value-maximizing strategies.  From February 2023 to the beginning of November 2023, White Oak and Fiera each made eight new money Protective Advances (as defined in the Prepetition Secured Term Loan Credit Agreement), with White Oak's Protective Advances in the aggregate amount of approximately $21.8 million and Fiera's Protective Advances in the aggregate amount of approximately $10.8 million.  From November 2023 to shortly before the Petition Date, White Oak alone provided twelve new money Protective Advances, ranging from $2 million to $15 million each, in an aggregate amount of $62.4 million, to assist the Debtors in their critical liquidity need.

---

[5]    This estimate does not reflect the total Allowed unsecured Claims against the Estates.  The Debtors have not completed their claims reconciliation process.  Therefore, the actual amount of Allowed unsecured Claims may vary materially from this estimate.

For over a year prior to the Petition Date, Lumio explored potential out-of-court solutions to raise capital or consummate a transaction to right-size the business. To that end, in August 2023, Lumio hired Houlihan as its investment banker to explore the market for equity capital. In addition, Lumio explored potential out-of-court equity transactions.

There were certain risks attendant to out-of-court transactions, however, that caused Lumio and its advisors to determine that such strategic alternatives were not actionable. Lumio operated in a highly regulated space and required licenses and permits from the various state and local jurisdictions where it operated to sell and install its solar panels. Potential purchasers of Lumio's business would have needed to already possess the required licenses in order to operate the business or would have needed to go through the processes required by the various jurisdictions to acquire the required licenses, a process that could take months depending on the jurisdiction. This would have likely required a significant, potentially complex transition period that would create uncertainty for Lumio's vendors, customers, and employees, all of whom could have severed ties with the business. And, given Lumio's severe liquidity constraints, the consummation of any out-of-court sale process would have required Lumio to receive significant additional funding.

Above all, and especially given the risk of an extended process, the Debtors feared accelerated attrition from their employees and salesforce given an increased perception in the market that Lumio was failing. Significant attrition from the salesforce would have been catastrophic to the Debtors' business, as it would have directly resulted in reduced revenue and deteriorated liquidity. Having already experienced attrition from its salesforce, Lumio determined that quickly and efficiently right-sizing the business was paramount in maintaining the salesforce's confidence in its employer.

These challenges, taken together with the significant market headwinds facing the company, required Lumio to pivot to a value-maximizing sale process through chapter 11. To that end, on August 6, 2024, Lumio re-engaged Houlihan to serve as its investment banker to market Lumio's assets for a going concern sale and to solicit potential third-party commitments to provide postpetition financing. Commencing their work immediately, on August 6, Houlihan contacted 35 potential lenders to provide third-party financing, four of whom executed non-disclosure agreements.

The Debtors did not receive any actionable third-party financing proposals. As a result, to provide the Debtors with the opportunity to run a value-maximizing sale process in chapter 11, White Oak agreed to provide a postpetition, senior-secured financing facility with principal amount of $8,000,000, which did not include any roll-up of the Prepetition Secured Term Loans, to allow the Debtors to fund their operations in accordance with an approved budget.

In addition, White Oak agreed to be the stalking horse bidder for the sale of the Debtors' assets. The Debtors and White Oak engaged in extensive and arms' length negotiations, resulting in the Stalking Horse Agreement, subject to higher and better bids and court approval. Pursuant to the Stalking Horse Agreement, White Oak agreed to purchase substantially all of the Debtors' assets, as well as designate a significant portion of Debtors' unexpired leases and executory contracts for assumption and assignment, in exchange for a credit bid of $100 million and the assumption of significant liabilities.

24

### 3.3    The Chapter 11 Cases.

(a)    *Generally.*

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is composed of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  After the Petition Date, the Debtors continued to operate their business as debtors and debtors in possession.  By order entered September 4, 2024 (D.I. 54), these chapter 11 cases are jointly administered for procedural purposes only.  No trustee or examiner has been appointed in these chapter 11 cases.  On September 11, 2024, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* in connection with these chapter 11 cases (D.I. 93).

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

(b)    *"First Day" Motions and Related Applications.*

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' Assets and minimize the effects of the commencement of these chapter 11 cases.  On September 5, 2024, the Bankruptcy Court entered interim orders providing various first-day relief approving:

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurances, (III) Establishing Procedures to Resolve Requests for Additional Assurance; and (IV) Granting Related Relief* (D.I. 4);

- *Motion of the Debtors for Entry of Interim and Final Orders (I)(A) Authorizing, but Not Directing, the Debtors to Continue their Insurance Programs, (B) Pay All Prepetition and Postpetition with Respect Thereto, (C) Continue to Pay Brokerage Fees, and (D) Renew, Supplement, Modify, or Purchase Insurance Coverage, and Pay Premiums Thereunder, and (II) Granting Related Relief* (D.I. 5);

- *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief* (D.I. 6);

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain their Customer Programs and Honor Customer Obligations, and (III) Granting Related Relief* (D.I. 7);

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate their Existing Cash Management System, (B) Pay or Honor Certain Prepetition Obligations Related Thereto, (C) Maintain their Bank Accounts and Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (II) Granting Related Relief* (D.I. 8);

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* (D.I. 9);

- *Debtors Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief* (D.I. 10); and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Term Loan Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (D.I. 13).

Between September 27, 2024 and October 2, 2024, the Bankruptcy Court entered orders approving each of the foregoing motions on a final basis.

(c)      *Retention of Professional Advisors.*

Pursuant to orders entered on September 27, 2024 and September 30, 2024, the Bankruptcy Court authorized the Debtors to retain and employ (a) Morris, Nichols, Arsht & Tunnell LLP as their bankruptcy counsel (D.I. 157), (b) Stretto as their administrative advisor (D.I. 165), (c) Houlihan as their investment banker (D.I. 174).

Pursuant to orders entered on October 29, 2024, the Bankruptcy Court authorized the Committee to retain and employ (a) Porzio, Bromberg & Newman, P.C. as their lead bankruptcy counsel (D.I. 281) and (b) Province, LLC as their financial advisor (D.I. 282).

On September 30, 2024, the Bankruptcy Court entered the Interim Compensation Procedures Order (D.I. 170), which established procedures for compensating and reimbursing all retained Professionals.

(d)     *Rejection of Executory Contracts and Unexpired Leases and Abandonment of Burdensome Assets.*

On the Petition Date, the Debtors filed three motions to reject, effective as of the Petition Date, certain unexpired leases of nonresidential real property and certain executory contracts that the Debtors determined they no longer required (D.I. 26, 27, 28).  With respect to the rejection of unexpired leases, the Debtors also requested authority to abandon any property remaining at the leased premises.  The Bankruptcy Court entered orders approving these rejection motions on September 24, September 27, and September 30, 2024 (D.I. 131, 151, 179).

On September 30, 2024, the Debtors filed another motion to reject certain unexpired leases of nonresidential real property (D.I. 179).  The Debtors also requested authority to abandon any property remaining at the leased premises.  The Bankruptcy Court entered an order approving this rejection motion on October 15, 2024 (D.I. 230).

Finally, on October 29, 2024, in connection with the Sale, the Debtors filed seven additional motions to reject all remaining unexpired leases of real property and executory contracts (D.I. 272, 273, 274, 275, 276, 277, 278).  With respect to the rejection of unexpired leases, the Debtors also requested authority to abandon any property remaining at the leased premises.  The Bankruptcy Court entered orders approving these rejection motions (D.I. 338, 339, 340, 341, 358, 359, 360), and the Debtors anticipate the Bankruptcy Court will enter orders approving the remaining rejection motions.  Pursuant to the Asset Purchase Agreement, the Purchaser has 15 days after the closing date of the Sale to identify any Executory Contracts it wishes to be Assigned Contracts as that term is defined in the Asset Purchase Agreement.

(e)     *Filing of the Debtors' Schedules and Establishment of the Bar Dates.*

On September 30, 2024, the Debtors filed redacted and unredacted versions of the schedules of assets and liabilities and statements of financial affairs for each Debtor.  (D.I. 175, 176, 180, 181, 182, 183).

On October 1, 2024, the Debtors filed the Bar Date Motion and on November 6, 2024, the Bankruptcy Court entered the Bar Date Order.  Pursuant to the Bar Date Order, the Bankruptcy Court established the following Bar Dates:

(1)     General Bar Date: **December 7, 2024, 5:00 p.m. prevailing Eastern Time** as the deadline to file a Proof of Claim in respect of any prepetition Claim against the Debtors, including, without limitation, any secured Claim, unsecured Claim, priority Claim, or 503(b)(9) Claim;

(2)     Governmental Bar Date: **March 3, 2025**, as the deadline by which a Governmental Unit must file a Proof of Claim in respect of a prepetition Claim against the Debtors;

27

(3)     Rejection Damages Bar Date: the later of (i) **December 7, 2024**, **5:00 p.m. prevailing Eastern Time** or, if applicable, the Government Bar Date and (ii) **5:00 p.m. prevailing Eastern Time** on the date that is thirty (30) days following service of an order approving rejection of an Executory Contract or Unexpired Lease of the Debtors as the deadline by which any Person or Entity asserting a Claim for damages against the Debtors arising from such rejection must file a Proof of Claim on account of such damages; and

(4)     Amended Schedules Bar Date: the later of (i) **December 7, 2024**, **5:00 p.m. prevailing Eastern Time** or, if applicable, the Government Bar Date and (ii) **5:00 p.m. prevailing Eastern Time** on the date that is thirty (30) days following service of notice of an amendment to the Debtors' Schedules as the deadline for any Person or Entity whose Claim is affected by such amendment to file, amend, or supplement a Proof of Claim with respect to such Claim.

(f)     *The Sale of Substantially All of the Debtors' Assets.*

The Debtors filed these chapter 11 cases to pursue a sale of all or substantially all of their Assets with the goal of maximizing the recovery for their Estates and Creditors. To that end, the Bankruptcy Court entered the Bidding Procedures Order granting certain of the relief sought in the Sale Motion, including, among other things, (a) approving the bidding procedures, which established the key dates and times related to the Sale and auction, (b) approving assumption procedures, and (c) authorizing the Debtors' entry into and performance under the Stalking Horse Agreement. The Bidding Procedures Order also established a bid deadline of October 7, 2024.

Notwithstanding entry of the Bidding Procedures Order, the Committee advised the Debtors and White Oak that it intended to object to the relief sought in the Sale Motion and the Final DIP Order. Accordingly, the Debtors and White Oak began extensive negotiations with the Committee to resolve its objections. The negotiations culminated in a consensual resolution of the Committee's objections and entry into a settlement term sheet that was attached as Exhibit A to the Final DIP Order.

The Debtors did not receive any bids for their Assets other than the Stalking Horse Bid prior to the bid deadline. As a result, the Debtors cancelled the auction.

In early October 2024, White Oak advised the Debtors that it would not proceed with the purchase of the Debtors' Assets pursuant to the Stalking Horse Agreement. The Debtors and their advisors pivoted to find an alternative buyer for the Debtors' assets to avoid the conversion of these chapter 11 cases to chapter 7 to the detriment of all stakeholders. Houlihan engaged in a broad outreach of both financial investors and strategic companies, including potential buyers previously identified in the Debtors' sale process. As a result of this process, negotiations between the Debtors and Zeo began in earnest. The parties engaged in extensive, arm's-length, good faith negotiations, and thereafter entered into the Asset Purchase Agreement on October 25, 2024. The Asset Purchase Agreement provides for a purchase price of the Debtors' Assets of (i) $4 million in cash proceeds, which is subject to White Oak's Liens in the Debtors Assets and White Oak's Liens pursuant to the Final DIP Order, (ii) the Equity Interests (as defined in the Asset Purchase Agreement), and (iii) the assumption of the Assumed Liabilities (as defined

in the Asset Purchase Agreement).  Pursuant to the Asset Purchase Agreement, the Equity Interests were transferred to White Oak as DIP Lender.  On November 1, 2024, the Court entered the Sale Order approving the Sale of the Debtors' Assets to the Purchaser pursuant to the Asset Purchase Agreement.  On November 4, 2024, the Sale approved by the Sale Order closed.

In connection with the Sale to the Purchaser, the Debtors, White Oak and the Committee again engaged in good-faith discussions which resulted in the Settlement Term Sheet. The material terms of the Settlement Term Sheet have been incorporated into this Combined Disclosure Statement and Plan and include, among other things:

(a)  White Oak's agreement to waive its Adequate Protection Liens (as defined in the Final DIP Order) and vote in favor of the Plan;

(b)  the Committee's recommendation that members of the Committee vote in favor of the Plan;

(c)  White Oak's agreement to pay the reasonable and documented expenses incurred by the Liquidating Trust to pursue recoveries from the Unsold Claim Assets;

(d)  the funding of the Liquidating Trust;

(e)  increasing the Carve-Out (as defined in the Final DIP Order) by $600,000 to satisfy the reasonable and documented fees and expenses incurred by the Committee's Professionals;

(f)  the GUC Recovery to General Unsecured Creditors;

(g)  the Prepetition Secured Term Loan Claims Distribution to the Prepetition Secured Term Loan Parties;

(h)  the recovery by White Oak of the Other Unsold Assets Proceeds; and

(i)  the exculpation and release of certain parties, including (i) the Debtors' current officers and directors, and VRS Restructuring Services, LLC; (ii) the members of the Committee; and (iii) the Related Parties of each of the foregoing.

(g)  *The Wind-Down of the Estates.*

Following the Sale of substantially all of the Debtors' Assets to the Purchaser, the Debtors are focused principally on winding down their Estates.  The Liquidating Trust Assets consist of Cash, the Unsold Claim Assets, and the Other Unsold Assets pursuant to the Settlement Term Sheet.  This Plan provides for the Liquidating Trust Assets to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan.

**ARTICLE IV**
**CONFIRMATION AND VOTING PROCEDURES**

**4.1    Confirmation Procedure.** On January [●], 2025, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan.  The Combined Hearing has been scheduled for **February 3, 2025 at 11:00 a.m. (prevailing Eastern Time)** to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Combined Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections.** Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) counsel for the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Robert J. Dehney, Sr. rdehney@morrisnichols.com, Matthew B. Harvey, mharvey@morrisnichols.com, and Matthew O. Talmo, mtalmo@morrisnichols.com; (b) counsel to the DIP Lender, Davis Polk & Wardell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Darren S. Klein, Esq. (darren.klein@davispolk.com) and Joanna McDonald, Esq. (joanna.mcdonald@davispolk.com) and Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801, Attn: Mark D. Collins (collins@rlf.com) and Amanda R. Steele (steele@rlf.com); (c) the U.S. Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, DE 19801, Attn: Joseph Cudia, joseph.cudia@usdoj.gov and Fang Bu, fang.bu@usdoj.gov and (d) counsel to the Committee Porzio, Bromberg & Newman, P.C., 300 Delaware Ave #1220, Wilmington, DE 19801, Attn: Warren J. Martin, Esq. (wjmartin@pbnlaw.com), Kelly D. Curtin (kdcurtin@pbnlaw.com), Cheryl A. Santaniello, Esq. (casantaniello@pbnlaw.com), Rachel A. Parisi, Esq. (raparisi@pbnlaw.com) and Christopher P. Mazza (cpmazza@pbnlaw.com); in each case, by no later than **January 27, 2025 at 4:00 p.m.** (prevailing Eastern Time).  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Combined Hearing.

**4.3    Requirements for Confirmation.** The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

**4.4      Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims

Allowed in the applicable Class. Additionally, any changes to the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 4.5    Impaired Claims or Interests.

Pursuant to the Plan and the provisions of the Bankruptcy Code, only classes of claims or interests that are Impaired under the Plan that are not deemed to reject the Plan may vote to accept or reject the Plan.

Under the Plan, only Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4, 5 and 6 are Impaired and deemed to reject the Plan. Therefore, Holders of Claims or Interests in Classes 4, 5, and 6 are not entitled to vote on the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

### 4.6    Confirmation Without Necessary Acceptances; Cramdown

In the event that any Impaired Class of Claims or Interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because Holders of Claims and Interests in Classes 4, 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, in part, as no Holder of a Claim or Interest junior to those in Classes 4, 5 and 6 will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests, provided that a debtor may be

afforded wide latitude for separately classifying and treating claims of the same priority based on, among other factors, the differing factual or legal nature or attributes of the claims or their holders. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, when taking into account the nature and attribute of such Claims and Interests and their Holders, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(a)     Secured Creditors. Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     Unsecured Creditors. Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)     Equity Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.7     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  Inasmuch as the Debtors' principal Assets have been liquidated and the Plan provides

for the Distribution of all the Cash proceeds of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trust to meet its discreet obligations under the Plan. Based on the Debtors' analysis, the Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.8    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are Impaired by that plan and that have not accepted the plan.  The  "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each Impaired Class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any Impaired Class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired Class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process and ultimate distribution of the Liquidating Trust Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the chapter 11 cases (such as compensation for professionals) that are allowed in the chapter 7 cases. Ultimately, the Prepetition Term Loan Secured Parties would need to consent to the use of their cash collateral to fund such a chapter 7 process, and there is no guarantee that they would do so. Without such consent, conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid

administrative and priority claims, as well as any costs incurred in administering the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the chapter 11 cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.  Attached hereto as **Exhibit A** is a hypothetical chapter 7 liquidation analysis.

### 4.9    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Interim Approval and Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT VIA EMAIL AT LumioInquiries@stretto.com WITH A REFERENCE TO "LUMIO" IN THE SUBJECT LINE; OR BY PHONE AT 855-328-2638 (DOMESTIC) OR +1 714-203-6409 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

### ARTICLE V
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

5.1    **The Plan May Not Be Accepted**.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

5.2    **The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

5.3    **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors, including the amount and value of assets available for Distribution and the number and value of Claims ultimately Allowed in these cases.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

5.4    **Objections to Classification of Claims**.

As previously described, section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and

hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.5     Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be Consummated.

### 5.6     Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates.  The estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Claims under the Plan.

### 5.7     Plan Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Article X of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan, or the Plan not being confirmed.

**5.8    Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtors described in this combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.   ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Unimpaired Claims are conclusively presumed to have accepted this Plan.  The Holders of Administrative Claims, Professional Fee Claims, Tax Claims, Other Priority Claims, and Other Secured Claims are not Impaired under this Plan.

**6.1    Administrative Claims.** Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for U.S. Trustee Fees) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (d) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  Any Allowed Administrative Claim (other than a Professional Fee Claim) that becomes due after the Effective Date shall be paid by the Liquidating Trustee from the First Tier Claims Reserve.  For the avoidance of doubt, Allowed Administrative Claims shall not be paid from the proceeds of the Unsold Claim Assets and the Other Unsold Assets.

Holders of Administrative Claims accruing from the Petition Date through the Effective Date, other than Holders of Professional Fee Claims and Claims for U.S. Trustee Fees, must file with the Claims Agent and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to be actually received on or before the

Administrative Claims Bar Date.  Any Person or Entity required to timely file such Claim but fails to do so shall not be treated as a Creditor with respect to such Claim for the purpose of Distribution in these chapter 11 cases on account of such Claim and will be barred, estopped, and enjoined from asserting such Claim against the Debtors.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Bar Date.

For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims is the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date through the Effective Date, is the Administrative Claim Bar Date, and neither deadline is extended by this Combined Disclosure Statement and Plan nor the Confirmation Order.

With respect to U.S. Trustee Fees, all fees due, payable, and/or may come due to the U.S. Trustee pursuant to section 1930 of Title 28 of the United States Code ("Quarterly Fees") on account of the period before the Effective Date shall be paid by the Debtors on the Effective Date, or as soon as practicable thereafter to the extent said amount was not yet due and/or billed. After the Effective Date, (i) the Liquidating Trust shall pay the U.S. Trustee Fees from the First Tier Claims Reserve and (ii) the Liquidating Trustee shall file quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Liquidating Trust during the applicable period.  The U.S. Trustee shall not be required to file a request for payment of its Quarterly Fees, which shall be deemed an Administrative Claim against the Debtors and their Estates.

**6.2    Professional Fee Claims**. As soon as reasonably practicable on or after the Confirmation Date (and in no event later than the Effective Date), the Debtors shall establish the Professional Fee Account and fund the Professional Fee Account with Cash equal to the amounts allocated for Professional Fee Claims set forth in the Approved Budget and Settlement Term Sheet, less any and all amounts previously paid pursuant to any Professionals' Fee Applications.  Each Professional shall be entitled only the amount budgeted for it in the Approved Budget.  The Professional Fee Account shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Liquidating Trust; *provided*, that after all Allowed Professional Fee Claims have been paid in full, Fee Applications in connection with all Professional Fee Claims have been Filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be distributed to the Liquidating Trust.  No Liens, Claims, or interests shall encumber the Professional Fee Account in any way.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed and served in accordance with the Interim Compensation Procedures Order by the date that is forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  If an application for a Professional Fee Claim is not Filed within forty-five (45) days after the Effective Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall

set forth the deadline to file requests for payment of Professional Fee Claims. Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application.

To the extent any Professional has incurred Professional Fee Claims in excess of the amount budgeted for it in the Approved Budget, such Professional shall be deemed to consent under section 1129(a)(9) of the Bankruptcy Code to payment of only those Professional Fee Claims that do not exceed the applicable budgeted amount for it in the Approved Budget and any Professional Fee Claims in excess of the applicable budgeted amount shall be deemed Disallowed, released, waived, or barred.

To the extent any inconsistency between the Confirmation Order, on the one hand, and any order approving a Fee Application (whether entered before or after the Confirmation Order) on the other, the Confirmation Order shall control.

**6.3    Tax Claims**. Unless otherwise agreed to by the Holder of an Allowed Tax Claim, each Holder of an Allowed Tax Claim will receive in full and final satisfaction of such Allowed Tax Claim Cash in an amount equal to the unpaid portion of such Allowed Tax Claim either: (a) if a Tax Claim is Allowed on or prior to the Effective Date, on the Effective Date by the Debtors; (b) if such Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Tax Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that all Allowed Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Liquidating Trustee in the ordinary course of business as they become due. Any Claim or demand for any penalty (a) will be subject to treatment as a General Unsecured Claim, if and to the extent it is an Allowed Claim, and (b) the Holder of an Allowed Tax Claim shall not assess or attempt to collect such amounts from the Debtors, the Estates, the Liquidating Trustee, or the Liquidating Trust except as a General Unsecured Claim, if and to the extent it is an Allowed Claim. Any Allowed Tax Claim that becomes due after the Effective Date shall be paid by the Liquidating Trustee from the First Tier Claims Reserve. For the avoidance of doubt, Allowed Tax Claims shall not be paid from the proceeds of the Unsold Claim Assets and the Other Unsold Assets.

**6.4    DIP Claims**. Upon the Effective Date, the DIP Claims shall be Allowed in the amount of $321,855.94, plus attorneys' fees payable under the DIP Orders. In full and final satisfaction of its Allowed DIP Claims, White Oak, as administrative agent under the DIP Financing Facility and as the exclusive Holder of Allowed DIP Claims, shall receive: (i) the White Oak Liquidating Trust Fee Reimbursement; (ii) the treatment set forth below with respect to its Allowed Prepetition Secured Term Loan Claims; (iii) the Other Unsold Assets Proceeds, *provided, however,* that White Oak shall appoint a liquidator to liquidate the Other Unsold Assets at White Oak's sole expense; and (iv) the Remaining First Tier Claims Reserve.

**ARTICLE VII**
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

The Claims in Classes 1 and 2 are Unimpaired, conclusively deemed to accept the Plan and are not entitled to vote on the Plan.  The Claims in Class 3 are Impaired and entitled to vote to accept or reject this Plan.  Holders of Claims in Classes 4 and 5 and Interests in Class 6 are conclusively deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

7.1 **Class 1: Other Priority Claims**.  Unless otherwise agreed to by the Holder of an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive in full and final satisfaction of such Allowed Other Priority Claim an amount of Cash equal to the unpaid portion of such Allowed Other Priority Claim either: (a) if an Other Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Other Priority Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Other Priority Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Liquidating Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  Any Allowed Priority Claim shall be paid by the Liquidating Trustee from the First Tier Claims Reserve.  For the avoidance of doubt, Allowed Priority Claims shall not be paid from the proceeds of the Unsold Claim Assets and the Other Unsold Assets.

7.2 **Class 2: Other Secured Claims.**  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, (a) Cash in an amount equal to the Allowed amount of such Claim; (b) its collateral in full satisfaction of its Claim; or (c) such other treatment sufficient to render such Holder's Allowed Other Secured Claim Unimpaired.

7.3 **Class 3: Prepetition Secured Term Loan Claims**.  On the Effective Date, the Prepetition Secured Term Loan Claims shall become Allowed Class 3 Claims in the aggregate amount of $248,390,182.23.  Except to the extent that the Prepetition Term Loan Secured Parties agree to less favorable treatment, each Holder of an Allowed Prepetition Secured Term Loan Claim shall receive their Pro Rate Share of the Prepetition Secured Term Loan Claims Distribution Amount. The Prepetition Term Loan Secured Parties' recovery shall not exceed the Prepetition Secured Term Loan Claims.

7.4 **Class 4: General Unsecured Claims.**  Except to the extent that the Holder of an Allowed Claim in Class 4 agrees to less favorable treatment (or such other treatment which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Class 4 Claim have agreed upon in writing), each Holder of an Allowed Claim in Class 4 shall receive in full and final satisfaction, settlement, and release of and in exchange for its Allowed Class 4 Claim, its Pro Rata Share of the GUC Recovery.  For the avoidance of doubt, the Prepetition Term Loan Secured Parties shall not receive any portion of the GUC Recovery.

41

**7.5    Class 5: Subordinated Claims**.  Holders of Subordinated Claims shall receive no Distribution on account of their Subordinated Claims pursuant to the Plan.

**7.6    Class 6: Equity Interests.** On the Effective Date, all Equity Interests shall be cancelled, and each Holder of an Equity Interest in any Debtor shall receive no Distributions pursuant to the Plan.

**7.7    Reservation of Rights Regarding Claims and Interests**. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### ARTICLE VIII
### ACCEPTANCE OR REJECTION OF THE PLAN

**8.1    Classes Entitled to Vote**.  Because Claims in Class 3 are Impaired, are not deemed to reject the Plan, and will receive or retain property or an interest in property under the Plan, the Holders of Class 3 Claims shall be entitled to vote to accept or reject the Plan.

**8.2    Acceptance by Impaired Classes of Claims or Interests**.  In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3    Presumed Acceptance by Unimpaired Classes**.  Because Claims in Classes 1 and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, Holders of such Claims are not entitled to vote to accept or reject the Plan.

**8.4    Presumed Rejections by Impaired Classes**.  Because Holders of General Unsecured Claims in Class 4, Subordinated Claims in Class 5 and Holders of Interests in Class 6 are presumed to have rejected the Plan, Holders of Claims and Interests in such Classes are not entitled to vote to accept or reject the Plan.

**8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6    Controversy Concerning Impairment**.  If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or before the Confirmation Date.

**8.7    Elimination of Vacant Classes**.  Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Combined Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance.

**8.8    Voting Classes; Deemed Acceptance by Non-Voting Classes.**  If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

**ARTICLE IX**
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

**9.1    Distributions on the Effective Date/Dissolution of Debtors**.  On the Effective Date, the Debtors shall be automatically and immediately deemed dissolved, in accordance with section 303 of the Delaware General Corporation Law without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; *provided* that notwithstanding such dissolution, the Liquidating Trustee shall retain the authority to file all applicable or necessary federal, state or local filings (including tax filings) to the extent required for each of the Debtors (including to the extent deemed necessary or appropriate by the Liquidating Trustee) to maximize the value of the Liquidating Trust Assets for Distribution of such Assets to Allowed Claims against each of the Debtors (and transferred to the Liquidating Trust on the Effective Date).

On the Effective Date, the Liquidating Trustee shall provide for the retention and storage of the books, records, and files that shall have been delivered to the Liquidating Trust until such time as all such books, records and files are no longer required to be retained under applicable law or as otherwise authorized by the Bankruptcy Court, and file a certificate or notice informing the Bankruptcy Court of the location at which such books, records and files are being stored.  With respect to any books and records that are not, in the view of the Liquidating Trustee, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtors or Liquidating Trust, any Causes of Action, or the wind-down of the Debtors' Estates, the Liquidating Trustee shall be free, in its reasonable discretion, to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and shall have no liability for same.

9.2     **Liquidating Trust**.

(a)     **Establishment of the Liquidating Trust**.  The Liquidating Trust shall be established and shall become effective on the Effective Date.

(b)     **Vesting of Liquidating Trust Assets**.  Upon the occurrence of the Effective Date, (a) the members of each Debtor's board of directors or managers, as the case may be, shall be deemed to have resigned; and (b) the Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with this Plan.  The Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, claims, and interests.

Upon transfer of the Liquidating Trust Assets, the Debtors shall have no further duties or responsibilities in connection with the implementation of this Plan.

(c)     **Liquidating Trust Assets**.  The Liquidating Trust Assets include: (i) all Cash held by the Debtors as of the Effective Date, excluding amounts held in trust with respect to the Professional Fee Account (except as otherwise expressly set forth in this Combined Disclosure Statement and Plan), (ii) the First Tier Claims Reserve, (iii) the Unsold Claim Assets, and (iv) the Other Unsold Assets, all of which are being transferred pursuant to this Plan to the Liquidating Trust upon the Effective Date.

(1)  **Cash as of the Effective Date.**  All Cash held by the Debtors as of the Effective Date will transfer to the Liquidating Trust (provided that the Professional Fee Account will continue to be maintained and held in escrow as set forth in section 6.2 of this Plan).  Cash shall include, but is not limited to, (i) all amounts remaining after the payment of the Professional Fee Claims, (ii) any remaining Sale Proceeds, and (ii) all Cash that was not purchased by the Purchaser.

(2)  **Retained Causes of Action.**  All Unsold Claim Assets will be contributed to the Liquidating Trust.  The Unsold Claim Assets, to the extent not liquidated prior to the Effective Date by the Debtors, are being preserved and contributed by the Debtors to the Liquidating Trust so that these Unsold Claim Assets may be investigated and prosecuted, if possible, by the Liquidating Trustee with any recoveries resulting therefrom to be distributed to the beneficiaries of the Liquidating Trust.  The Liquidating Trust shall have the authority and standing to bring and litigate all Unsold Claim Assets.  No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will pursue or not pursue any and all Causes of Action.  The Liquidating Trustee and the Debtors expressly reserve all rights to prosecute any and all Unsold Claim Assets of the Debtors against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.

All Causes of Action of the Debtors and their Estates related to the Asset Purchase Agreement shall also vest in the Liquidating Trust.

Pursuant to the Sale Order, the Purchaser purchased certain of the Debtors' Causes of Action, which, for the avoidance of doubt, are not Unsold Claim Assets.

(3)    **Other Unsold Assets**.  Notwithstanding anything contrary herein, White Oak shall appoint a liquidator at White Oak's sole expense to liquidate the Other Unsold Assets.  All Other Unsold Assets Proceeds shall be distributed to White Oak.

(d)    **Creation and Maintenance of Trust Accounts**.  On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trust.  Cash deposited in the trust accounts will be invested, held, and used solely as provided in the Liquidating Trust Agreement. The Liquidating Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidating Trust Agreement, as applicable.  After the funding of the trust accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition, or other monetization of the Liquidating Trust Assets.  Upon obtaining an order of the Bankruptcy Court authorizing final Distributions, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Liquidating Trust Agreement, and the trust accounts may be closed.

(e)    **Trust Distributions**.  All Distributions to the Holders of (i) Allowed General Unsecured Claims, (ii) Prepetition Secured Term Loan Claims, and (iii) Administrative Claims, Tax Claims, Other Secured Claims and Other Priority Claims that are not Allowed as of the Effective Date but subsequently Allowed, shall be from the Liquidating Trust.  The Liquidating Trust shall, among other things, administer the Liquidating Trust Assets.  The Liquidating Trustee shall distribute the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement. Notwithstanding anything contrary herein, the Liquidating Trustee shall distribute any distributions on account of any Prepetition Secured Term Loan Claims to the Prepetition Secured Term Loan Agent and the Prepetition Secured Term Loan Agent shall distribute such distributions to Holders of Allowed Prepetition Secured Term Loan Claims subject to and in accordance with Prepetition Secured Term Loan Credit Agreement.

(f)    **Duration of the Trust**.  The Liquidating Trust shall have an initial term of two years; *provided*, *however*, that the Liquidating Trustee shall be authorized to extend the Liquidating Trust.  The Liquidating Trust may be terminated earlier than its scheduled termination if the Liquidating Trustee determines that it has administered all the Liquidating Trust Assets and performed all other duties required by this Plan and the Liquidating Trust Agreement.  As soon as practicable after the final Distribution Date (unless all asserted Claims are

resolved sooner), the Liquidating Trustee shall seek entry of a Final Order closing the chapter 11 cases pursuant to section 350(a) of the Bankruptcy Code.

**9.3    Liquidating Trustee**.

(a)    **Appointment**.    The initial Liquidating Trustee shall be acceptable to the Debtors, Committee and White Oak.  The appointment of the Liquidating Trustee shall be approved in the Confirmation Order and be effective as of the Effective Date.  Successor Liquidating Trustee(s) shall be appointed as set forth in the Liquidating Trust Agreement.

(b)    **Term**.    The Liquidating Trustee's term, including without limitation the term of any Successor Liquidating Trustee(s), shall expire upon termination of the Liquidating Trust pursuant to this Plan and/or the Liquidating Trust Agreement.

(c)    **Removal**.    The U.S. Trustee or any Creditor may request the removal of the Liquidating Trustee for "cause" pursuant to a motion Filed with the Bankruptcy Court and served upon (a) the Liquidating Trustee and its counsel, (b) the U.S. Trustee (if not the movant), (c) White Oak and its counsel and (d) all other Entities that have formally requested notice pursuant to Bankruptcy Rule 2002.  In connection with any such motion to remove the Liquidating Trustee, "cause" will include: (a) the Liquidating Trustee's willful failure to perform his, her or its material duties hereunder, which is not remedied within thirty (30) days of notice; (b) the Liquidating Trustee's death; (c) the Liquidating Trustee's mental or physical incapacity that materially and adversely affects the Liquidating Trustee's ability to perform his, her or its duties under the Plan; (d) the Liquidating Trustee's commission of an act of fraud, theft or embezzlement in connection with the Liquidating Trustee's duties under this Plan; (e) the Liquidating Trustee's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; *provided*, *however*, that no "cause" shall exist involving clause (a) above until the Liquidating Trustee first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.  For purposes of the foregoing, no act or failure to act on the part of the Liquidating Trustee shall be considered "willful" unless it is done, or permitted to be done, by the Liquidating Trustee without reasonable belief that the Liquidating Trustee's action or omission was in the best interests of the Debtors.

(d)    **Powers and Duties**.    The Liquidating Trustee shall be the exclusive representative of the Debtors' Estates and shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code.  The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and this Plan.  The Liquidating Trustee shall administer the Liquidating Trust, and the Liquidating Trust Assets, and make Distributions in accordance with this Plan and the Liquidating Trust Agreement.  In addition, the Liquidating Trustee shall, in accordance with the terms of this Plan, take all actions necessary to wind

down the affairs of the Debtors consistent with this Plan and applicable non-bankruptcy law.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation:

(i)     To exercise all power and authority that may be or could have been exercised and take all actions that may be or could have been taken by the Debtors with like effect as if authorized, exercised and taken by unanimous action of the Debtors' partners, members, officers, directors and equity holders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of any Debtors' attorney/client privilege;

(ii)    To implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment and maintenance of appropriate reserves in accordance with this Plan and the Liquidating Trust Agreement, in the name of the Debtors or the Liquidating Trustee, even in the event of the dissolution of the Debtors;

(iii)   Subject to the applicable provisions of the Plan, to administer the winding-up of the affairs of the Debtors;

(iv)    To take all actions necessary to preserve and maximize the value of the Liquidating Trust Assets;

(v)     To prosecute the Causes of Action transferred to the Liquidating Trust, by which the Liquidating Trust is hereby granted standing to prosecute any of such Causes of Action and the authority to settle such Causes of Action without Bankruptcy Court approval;

(vi)    To maintain customary insurance coverage for the protection of the Liquidating Trustee and professionals on and after the Effective Date;

(vii)   To object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

(viii)  To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and to pay, from the Liquidating Trust Assets, (i) the charges incurred by the Liquidating Trust on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or

related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court; *provided, however,* White Oak shall appoint a liquidator at White Oak's sole expense for liquidation of the Other Unsold Assets;

(ix)     To cause, on behalf of the Liquidating Trust, the Debtors, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan;

(x)     To maintain appropriate books and records (including financial books and records) to govern the liquidation and distribution of the Liquidating Trust Assets, *provided*, *however*, that any abandonment or destruction of books and records shall require Bankruptcy Court approval, upon notice and a hearing;

(xi)     To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these chapter 11 cases or the chapter 11 cases are converted or dismissed;

(xii)     To dissolve the Liquidating Trust if the Liquidating Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the Liquidating Trust so as to make a final distribution is likely to exceed the value of the remaining Liquidating Trust Assets;

(xiii)     To seek one or more final decrees closing the Debtors' chapter 11 cases;

(xiv)     To do all other acts or things consistent with the provisions of this Plan that the Liquidating Trustee deems reasonably necessary or desirable with respect to implementing this Plan; and

(xv)     To be the Estate representative and successor of the Debtors and the Committee for all purposes.

(e)     **Limitation of Liability; Exculpation of Liquidating Trustee**.  The Liquidating Trustee and its agents and professionals shall not be liable for actions taken or omitted in their respective capacities as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except those acts arising out of its or their gross negligence, actual fraud, or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The Liquidating Trustee (and its agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee or

the Liquidating Trust, except for any actions or inactions involving gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claims of the Liquidating Trustee and the other parties entitled to indemnification under this subsection shall be satisfied from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its professionals.

(f) **Records.** The Liquidating Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors, to the extent available, as may be necessary for the disposition of Liquidating Trust Assets and objections to Disputed Claims.

(g) **Insurance.** The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

**9.4    Fees and Expenses**. From and after the Effective Date, the Unsold Claims Assets Liquidating Trust Expenses shall be paid by White Oak in the ordinary course of business, in accordance with the Plan and the Liquidating Trust Agreement. White Oak shall be entitled to the White Oak Liquidating Trust Fee Reimbursement on account of payment of the Unsold Claims Assets Liquidating Trust Expenses. Further, White Oak shall pay all reasonable and documented expenses incurred by a liquidator to administer the Other Unsold Assets. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidating Trustee, on behalf of the Liquidating Trust, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional (including professionals previously employed by the Debtors, but excluding any Affiliates, relatives or Related Persons to the Liquidating Trustee) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidating Trustee, are necessary to assist the Liquidating Trustee in the performance of the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement, subject to any limitations and procedures established under the Liquidating Trust Agreement.

**9.5    Liquidating Trustee as Estate Representative and Successor**. Pursuant to sections 1123(a)(5)(B), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the Liquidating Trustee shall be the representative of the Debtors' Estates and successor to the Debtors for all purposes. The Liquidating Trustee shall have all rights and powers of a trustee under the Bankruptcy Code. The Liquidating Trustee also shall be the successor to the Committee for all purposes.

**9.6    Distributions**. Except as otherwise provided in this Plan, the Liquidating Trustee shall make Distributions in accordance with the Liquidating Trust Agreement; *provided*, *however*, that the Liquidating Trustee may postpone any Distribution if the Liquidating

Trustee determines that the amount of such Distribution would be too small to justify the administrative costs associated with making it. The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

       **9.7**    **Corporate Action.**  Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee or the Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Trustee or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

       **9.8**    **Directors, Officers, Managers, Members and Authorized Persons of the Debtors.**  On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Liquidating Trustee, such directors and officers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date.

       **9.9**    **Closing of the Chapter 11 Cases.**  On the Effective Date, the Liquidating Trustee or the Debtors, in consultation with the Liquidating Trustee, shall be authorized to file a motion requesting entry of an order of this Court closing the chapter 11 case of *In re Lumio HX, Inc.*  Such motion may be heard by the Court on fourteen-days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). Each Wind-Down Estate shall be deemed to appoint the Liquidating Trustee to prosecute claims and defenses and make Distributions and attend to other wind-down affairs on behalf of each of the other prior Debtors as if such Wind-Down Estates continued to exist solely for that purpose. The Liquidating Trustee shall, promptly after the full administration of the chapter 11 cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court and file a motion under Local Rule 3022-1(a) to close the chapter 11 case of *In re Lumio Holdings, Inc., et al.* and of any other Debtor whose case remains open at that time.  Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the chapter 11 cases pursuant to Local Rule 3022-1(c).

       **9.10**    **Committee**. On the Effective Date, the Committee will be deemed dissolved and cease to exist.  The dissolution of the Committee under this Section shall not prevent any Professional from filing a Professional Fee Claim for service provided to the Committee and receiving payment for fees and costs with respect to the same.

       **9.11**    **Effectuating Documents; Further Transactions**. On the Effective Date, the Liquidating Trustee and the Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without

the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**9.12    Release of Liens**.  Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with this Plan, on the Effective Date, all mortgages, deeds of trust, Liens, or other security interests against the property of the Estates shall be released.  The Liquidating Trustee shall have the authority to file lien releases in connection with the foregoing.

**9.13    Exemption from Certain Transfer Taxes**.  To the maximum extent provided by section 1146 of the Bankruptcy Code, under this Plan, (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Liquidating Trustee elects to sell any property after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(a) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the chapter 11 cases shall be deemed to be or have been done in furtherance of this Plan.

**9.14    Setoffs**.  On or after the Effective Date, the Liquidating Trustee, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Liquidating Trustee may hold against the Holder of such Claim.

**9.15    Withdrawal of Plan**.  The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to Consummate this Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

**9.16    Insurance Preservation**.  Nothing in this Plan shall diminish or impair the enforceability of any Insurance Policy and related agreements that may cover Claims and Causes of Action against the Debtors, the D&Os, or any other Entity.  Without limiting the foregoing, and notwithstanding anything else in this Plan, (i) nothing in this Plan shall limit any insured from obtaining coverage under any of the Insurance Policies and related agreements, *provided*, *however*, that other orders of the Bankruptcy Court, whether entered before or after the Effective Date, may limit insureds from obtaining the proceeds of such coverage for reasons other than this Plan and shall not be affected by this Plan; and (ii) nothing in this Plan (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction, discharge, or a release) shall in any way operate to impair, diminish, or waive, or have the effect

of impairing, diminishing or waiving, the legal or contractual rights, claims, defenses, liabilities or obligations of any Entity, including, without limitation, the Debtors, the Committee, the Prepetition Term Loan Secured Parties, the Liquidating Trust, the Liquidating Trustee, the D&Os and any insurers, pursuant to any insurance policies and related agreements, including, without limitation, the terms, conditions, limitations, exclusions, and endorsements thereof, that may cover Claims or Causes of Action against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, the D&Os, any insurers or any other Entity.

**9.17    D&O Insurance Policies.** As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Insurance Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Insurance Policies shall remain in full force and effect subject to the terms and conditions of the D&O Insurance Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Insurance Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  For the avoidance of doubt, the D&O Insurance Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.  On and after the Effective Date, the Debtors or the Liquidating Trustee shall not terminate or otherwise reduce the coverage under any of the D&O Insurance Policies in effect or purchased as of the Petition Date, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.  For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the Bar Date Order or other order of the Bankruptcy Court.

**9.18    Indemnification of Directors, Officers, and Employees.** For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of their directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date.

**9.19    Withholding and Reporting Requirements.**

(a)    **Withholding Rights.** In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the

Plan shall be liable for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b) **Forms.** Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 or any other form or document as reasonably requested by the Liquidating Trustee or such other Person designated by it to eliminate or reduce any tax (including withholding tax), unless the Liquidating Trustee or such other Person designated by it determines it is not required to eliminate or reduce any tax (including withholding tax). If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the Holder fails to comply before the date that is 150 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trust, and any Claim in respect of such Distribution shall be forever barred from assertion against any Debtor and its respective property (or the Liquidating Trust or Liquidating Trustee).

9.20 **Cancellation of Existing Interests, Securities and Agreements (Including Cancellation of any Authorized but Unissued Shares).** On the Effective Date, notwithstanding anything to the contrary in the Plan, every document, agreement, or instrument (including but not limited to certificates, agreements, options, warrants, rights, RSUs, Shares, Preferred Shares, and other instruments evidencing an ownership interest in the Debtors, whether contractual, legal, equitable, or otherwise) evidencing any Interest in or Claim against the Debtors, shall be deemed automatically and immediately cancelled and surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under any such document, agreement, or instrument evidencing any Interest in or Claim against the Debtors, as the case may be, shall be deemed extinguished; *provided*, that, the provisions of any such document, agreement or instrument that governs the rights of the Holder of a Claim shall continue in full force and effect solely to the extent necessary to allow Holders of Allowed Claims to receive Distributions or exercise rights solely with respect to Allowed Claims under the Plan.

For the avoidance of doubt, all authorized but unissued shares of the Debtors shall also be deemed automatically and immediately cancelled as of the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors with respect to such authorized shares shall be deemed immediately extinguished and terminated as of the Effective Date.

Additionally, as of the Effective Date, consistent with the cancellation of the Interests (including any authorized and/or issues shares of common stock in the Debtors) in the Debtors, the Debtors' securities registered under the Securities Exchange Act of 1934, as amended (and the rules and regulations promulgated thereunder), shall be automatically deregistered and all related reporting obligations with the United States Securities and Exchange Commission shall be automatically terminated.

The Debtors and the Liquidating Trustee are authorized (but not required), as of the Effective Date, to file with the Securities and Exchange Commission a Form 15 on behalf of the Debtors for the purpose of codifying the suspension of the duty to file reports under Sections 13 and 15(d) of the Securities Exchange Act of 1934, as amended, and shall be authorized (but not required) to file such Form 15 on or after the Effective Date (to the extent the Debtors have not previously filed such Form 15).

## ARTICLE X
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**10.1    Binding Effect**. This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

By participating in the Plan by voting or by accepting Distributions pursuant to the Plan (in whatever sum), each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such Holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such Holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever.  For the avoidance of doubt, any Holder of a Claim or Interest that opts out of the voluntary releases contained in Section 10.7 of the Plan by (i) checking the "opt out" box on the Ballot, and returning it in accordance with the instructions set forth thereon, or (ii) checking the "opt out" box on the Opt-Out Election Form and returning it in accordance with the instructions set forth thereon, shall not be bound by the voluntary releases contained in Section 10.7 of the Plan.

**10.2    Treatment of Claims**  Notwithstanding anything contained in this Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled and compromised pursuant to this Plan.

**10.3    No Discharge of the Debtors**. Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; *provided, however*, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, any of the Estates, the Liquidating Trust, the Liquidating Trustee and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

**10.4    Injunction**.

(a)    **From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan, from taking any of the following actions against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(b)    **Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Persons, shall be enjoined from taking any actions to interfere with the implementation or substantial Consummation of this Plan by the Debtors, the Liquidating Trustee and/or their respective Related Persons, as applicable.**

(c)    **By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the Injunctions set forth in this Section.**

**10.5    Exculpation**.

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each of the Exculpated Parties are hereby exculpated from any liability for, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, or loss arising on or after the Petition Date through the Effective Date in connection with or arising out of the filing or administration of the chapter 11 cases, the postpetition marketing and sale process, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the Sale, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or Consummation of the Plan; the occurrence of the Effective Date; the DIP Credit Agreement; the post-Effective Date administration of the Plan or the property to be

distributed under the Plan (including Liquidating Trust Assets); the creation of the Liquidating Trust; or the transactions in furtherance of any of the foregoing; except for gross negligence, bad faith or willful misconduct, as determined by a Final Order, but in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

        10.6     **Releases by the Debtors**.

        Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and their Estates, in each case, on behalf of themselves and their respective successors (including the Liquidating Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based on or relating to, in whole or in part, on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, including, without limitation, (i) the chapter 11 cases; (ii) the Combined Plan and Disclosure Statement; (iii) the subject matter of, or the transaction or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (iv) the business or contractual arrangements between any Debtor and any Released Party; (v) the negotiation, formulation or preparation of this Combined Plan and Disclosure Statement, the Plan Supplement, the Settlement Term Sheet, or related agreements, instruments or other documents; (vi) the sale process, Sale or its related transaction documents, and the negotiation, formulation or preparation of the Sale and the related transaction documents; and (vii) the confirmation or Consummation of this Plan or the solicitation of votes on this Plan.

        Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release:  (i) any Claims or Causes of Action of the Debtors or any of their respective subsidiaries (a) against any of their respective predecessors, (b) against any former D&Os of the Debtors, and (c) arising under or relating to any asset purchase agreement, share purchase agreement, merger agreement or similar agreement (or any ancillary agreement entered into thereunder, excluding, in case and for the avoidance of doubt, the Stalking Horse Agreement; and (ii) (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is

determined in a Final Order to have constituted intentional fraud, willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.7    **Releases by Creditors**.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, except (i) for the right to enforce the Plan, and (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released by the Releasing Parties in each case, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law or equity, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date (including prior to the Petition Date), from, in whole or in part, the Debtors, the chapter 11 cases, the pre-and post-petition marketing and sale process, the Sale, the DIP Financing Facility or any related agreements, instruments, and other documents relating thereto, the purchase, sale, or rescission of the purchase or sale of any securities issued by the Debtors, the ownership of any securities issued by the Debtors, the subject matter of, or the transactions or events giving rise to,  any Claim or Interest that is treated in the Plan, the administration or implementation of the Plan, including the issuance or Distribution of the Liquidating Trust Assets pursuant to the Plan, the creation of the Liquidating Trust, the business or contractual arrangements between any Debtor and any Released Party, the Settlement Term Sheet, the Disclosure Statement, the Plan (including any Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.8    **Extinguishment of Intercompany Claims**. Following the Effective Date, any Claims that any of the Debtors may have against another Debtor shall be forever waived,

released, and extinguished for all purposes and no Debtor shall have a Claim or Administrative Claim Allowed against the Estate of any other Debtor.

**10.9    Terms of Injunctions or Stays.** Unless otherwise provided in this Plan, all injunctions or stays provided for in these chapter 11 cases pursuant to Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Cases are closed.

## ARTICLE XI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**11.1    Executory Contracts and Unexpired Leases Deemed Rejected**.  On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with the Sale) shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is an Insurance Policy or a D&O Insurance Policy; or (iii) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  Executory Contracts and Unexpired Leases identified for assumption on the Assumption Schedule shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

**11.2    Claims Based on Rejection of Executory Contracts and Unexpired Leases.**  Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than forty-five (45) days after the notice of occurrence of the Effective Date.  The notice of occurrence of the Effective Date shall include the date by which Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases must be filed.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be forever barred from assertion, and shall not be enforceable against the Debtors, the Liquidating Trust, the Debtors' Estates, or the property for any of the foregoing, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

**11.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**  Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in full in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidating Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Liquidating Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of one or more Final Orders, which may include the Confirmation Order, resolving the dispute and approving the assumption or assumption and assignment (as applicable); provided, that the Debtors or the Liquidating Trust (as applicable) may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**11.4     Modifications, Amendments, Supplements, Restatements or Other Agreements**. Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the chapter 11 cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**11.5     Reservation of Rights**. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease in the Assumption Schedules or the Sale Order, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or the Liquidating Trustee, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## ARTICLE XII
## DISTRIBUTIONS

**12.1    Distribution Record Date**.  The Debtors and the Liquidating Trustee shall have no obligation to recognize any transfer of the Claims (i) occurring on or after the Effective Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

**12.2    Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a)    **Delivery of Distributions in General**.  Distributions to Holders of Allowed Claims shall be made (i) at the addresses set forth on the Proofs of Claim filed by such Holders, (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address, (iv) at the addresses set forth in the other records of the Debtors or the Liquidating Trustee at the time of the Distribution, or (v) any change of address as reflected on the Bankruptcy Court docket.

Distributions shall be made from the Liquidating Trust, as applicable, in accordance with the terms of this Plan and, if applicable, the Liquidating Trust Agreement.

In making Distributions under this Plan, the Liquidating Trustee may rely upon the accuracy of the claims register maintained by the Claims Agent in these chapter 11 cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b)    **Undeliverable and Unclaimed Distributions**.  If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Liquidating Trustee shall use reasonable efforts to determine such Creditor's then-current address.  Unclaimed Distributions shall be returned to the Liquidating Trust until such Distributions are claimed.

(c)    **Treatment of Unclaimed Distributions**.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys,

representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Liquidating Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan and the Liquidating Trust Agreement.  Nothing contained in this Plan, or the Liquidating Trust Agreement shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim; *provided, however*, that in his, her or its sole discretion, the Liquidating Trustee may periodically publish notice of Unclaimed Distributions.

**12.3    Interest on Claims**.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

**12.4    Withholding and Reporting Requirements**.  In connection with this Plan and all Distributions under this Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

Except for the Prepetition Term Loan Secured Parties, all Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information.  Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the Liquidating Trustee, an Undeliverable Distribution pursuant to section 12.2(b) of this Plan; or (ii) if such information is not received by the deadline established by the Liquidating Trustee and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with section 12.2(c) of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Debtors (for Distributions to be made on the Effective Date as set forth in Section 9.1 of the Plan) or Liquidating Trustee (for all other Distributions) for the payment and satisfaction of such withholding tax

obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution.

   **12.5**   **Miscellaneous Distribution Provisions**.

     (a)   **Method of Cash Distributions**. Any Cash payment to be made by the Debtors or Liquidating Trustee, as applicable, pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Debtors or Liquidating Trustee, as applicable, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  In the case of foreign creditors, Cash payments may be made, at the option of the Debtors or Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular jurisdiction.

     (b)   **No Distribution in Excess of Amount of Allowed Claim**. Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

     (c)   **Distributions on Non-Business Days**. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

   **12.6**   *De Minimis* **Distribution Provisions**. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100.00.  Any Distribution not made pursuant to this Section 12.6 shall be treated as an Unclaimed Distribution and is subject to Section 12.4 hereof, without regard to any time limits in Section 12.5(c).

   **12.7**   **Residual Assets**.   After final Distributions have been made in accordance with the terms of the Plan, the unrestricted Cash remaining with the Liquidating Trust shall be remitted to the Prepetition Term Loan Secured Parties.

## ARTICLE XIII
## PROCEDURES FOR DISPUTED CLAIMS

   **13.1**   **Objections to Claims**. Unless otherwise provided in this Plan, after the Effective Date through the applicable Claims Objection Deadline, the Liquidating Trustee shall have standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim.  Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors, a party in interest or the Liquidating Trustee, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.

   **13.2**   **Estimation of Claims**. The Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of

whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  If the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

      **13.3    Disputed Claims Reserve**.  On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee may establish and administer a Disputed Claims Reserve for Disputed Claims in accordance with the Liquidating Trust Agreement.  The Liquidating Trustee may reserve in Cash the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim.  For the avoidance of doubt, the Liquidating Trustee may administer the Disputed Claims Reserves by book entry.

      **13.4    No Distribution Pending Allowance**.  No Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim; provided however, that a Distribution may be made on an Allowed portion of a Claim pending adjudication of the Disputed portion of such Claim.

      **13.5    Resolution of Claims**.  Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidating Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidating Trust may hold against any Person, and any contract, instrument, release, indenture or other agreement entered into in connection herewith. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this section 13.5 or elsewhere in this Combined Disclosure Statement and Plan, the Liquidating Trustee may not settle or compromise any Administrative Claim in an Allowed amount that exceeds $250,000 without consulting with White Oak in advance.

      **13.6    Amendments to Late Filed Claims**.  Following the Effective Date, except as otherwise provided in this Plan (including with respect to the filing of Claims by Governmental Units by the Governmental Bar Date), the Confirmation Order or the Liquidating Trust Agreement, no Claim may be filed, amended or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Liquidating Trustee, and any such new or amended Claim filed without such  prior authorization shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court.

**13.7    Insured Claims**.  If any portion of an Allowed Claim is an Insured Claim, no Distributions under the Plan shall be made on account of such Allowed Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged (i) without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court and (ii) with a notice of satisfaction filed on the docket and served on the applicable claimant or interest holder.

## ARTICLE XIV
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**14.1    Conditions to Confirmation**. The following are conditions precedent to the occurrence of the Confirmation Date.

(a)    A Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

(b)    Entry of a Confirmation Order that is in form and substance acceptable in all respects to the Debtors, the Committee and White Oak;

(c)    All documents contained in the exhibits and the Plan Supplement are in form and substance acceptable in all respects to the Debtors, the Committee and White Oak are approved by the Bankruptcy Court; and

(d)    Approval of all provisions, terms, and conditions hereof shall be contained in the Confirmation Order.

**14.2    Conditions to Effective Date**. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing:

(a)    The Confirmation Order shall have been entered and shall provide that the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan and effectuate, advance, or further the purposes thereof;

(b)    The Confirmation Order, the Plan and all Plan Exhibits shall be, in form and substance acceptable in all respects to the Debtors and shall have been executed and delivered by all parties signatory thereto;

(c)    All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed;

(d)    The First Tier Claims Reserve shall have been funded in accordance with Article I.A.1.60 of this Plan;

(e)      The Confirmation Order shall have become a Final Order; and

(f)      The Debtors shall have filed a Notice of Effective Date.

**14.3    Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court enters an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**14.4    Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**14.5    Effect of Vacatur of Confirmation Order.**  If the Confirmation Order is vacated, (a) no further Distributions under the Plan shall be made; (b) the Debtors and all Holders of Claims and Interests shall, to the extent deemed possible, be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## ARTICLE XV
## ADMINISTRATIVE PROVISIONS

**15.1    Retention of Jurisdiction**. Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a)      To determine the allowability, classification, or priority of Claims upon objection of the Liquidating Trustee or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)      To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in these chapter 11 cases on or before the Effective Date with respect to any Entity;

(c)    To protect the property of the Estates, including Liquidating Trust Assets, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates or Liquidating Trust Assets;

(d)    To determine any and all applications for allowance of Professional Fee Claims;

(e)    To determine any Other Priority Claim, Administrative Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)    To resolve any disputes arising under or related to the implementation, execution, consummation, or interpretation of this Plan and the making of Distributions hereunder;

(g)    To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or Unexpired Lease pursuant to section 11.1 of this Plan;

(h)    To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of these chapter 11 cases, including any remands;

(i)    To enter one or more Final Orders closing the Debtors' chapter 11 cases;

(j)    To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order to carry out its intent and purposes;

(k)    To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)    To enable the Liquidating Trustee to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties, or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)    To determine any tax liability of the Debtors or the Liquidating Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the Liquidating Trustee or the Liquidating Trust for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the chapter 11 cases, the Bar Date Order or the otherwise applicable Claims bar date, the hearing to consider approval of the Disclosure Statement or the Combined Hearing;

(p)     To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these chapter 11 cases;

(q)     To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(r)     To approve any Distributions, or objections thereto, under this Plan;

(s)     To approve any Claims settlement entered into or offset exercised by the Liquidating Trustee; and

(t)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

## 15.2   Amendments.

(a)   **Preconfirmation Amendment.**  The Debtors may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Plan, as modified, and the disclosure statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b)   **Postconfirmation   Amendment   Not   Requiring Resolicitation.**  After the entry of the Confirmation Order, the Debtors may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that: (i) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

(c)   **Postconfirmation and Pre-consummation Amendment Requiring Resolicitation.**  After the Confirmation Date and before substantial consummation of this Plan, the Debtors may modify this Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that: (i) this Plan, as modified, meets

applicable Bankruptcy Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class materially or adversely affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to this Plan as modified.

**15.3     Successors and Assigns**.  The rights, benefits and obligations of any person or entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or entity.

**15.4     Governing Law**. Except to the extent that the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

**15.5     Corporate Action**. Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Liquidating Trustee, as the case may be.

**15.6     Effectuating Documents and Further Transactions**. The Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of this Plan.

**15.7     Confirmation Order and Plan Control**. To the extent this Combined Disclosure Statement and Plan is inconsistent with the Liquidating Trust Agreement, this Combined Disclosure Statement and Plan controls over the Liquidating Trust Agreement.  To the extent the Confirmation Order is inconsistent with this Combined Disclosure Statement and Plan or the Liquidating Trust Agreement, the Confirmation Order (and any other orders of this Bankruptcy Court) controls over this Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

**15.8     Miscellaneous Rules.**  This Combined Plan and Disclosure Statement is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iii) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after", such date.

**15.9     Notices**. All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**Liquidating Trustee:**
To be provided in the Plan Supplement

**Debtors:**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney, Sr.
Matthew B. Harvey
Matthew O. Talmo
Scott D. Jones
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
Tel: (302) 658-9200
Email:  rdehney@morrisnichols.com
            mharvey@morrisnichols.com
            mtalmo@morrisnichols.com
            sjones@morrisnichols.com

**15.10  No Admissions or Waiver**. Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

*/s/ Jeffrey T. Varsalone*
Jeffrey T. Varsalone, CRO

**<u>Exhibit A</u>**

Liquidation Analysis