**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUMIO HOLDINGS, INC., *et al.*,[1] | Case No. 24-11916 (JKS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: January 3, 2025 at 1:00 p.m. ET**<br>**Obj. Deadline: December 30, 2024 at 4:00 p.m. ET**<br>(extended for U.S. Trustee)<br>**Re: D.I. 379, 380** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) APPROVING THE COMBINED DISCLOSURE
STATEMENT AND PLAN ON AN INTERIM BASIS FOR SOLICITATION PURPOSES
ONLY; (II) ESTABLISHING PROCEDURES FOR SOLICITATION AND
TABULATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DISCLOSURE
STATEMENT AND PLAN; (III) APPROVING THE FORM OF BALLOT AND
SOLICITATION PACKAGES; (IV) ESTABLISHING THE VOTING RECORD DATE;
(V) SCHEDULING A COMBINED HEARING FOR FINAL APPROVAL OF THE
ADEQUACY OF DISCLOSURES IN, AND CONFIRMATION OF THE COMBINED
DISCLOSURE STATEMENT AND PLAN; (VI) APPROVING THE FORM OF
COMBINED HEARING NOTICE, AND (VII) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Region Three ("U.S. Trustee"), through his

undersigned counsel, hereby objects ("Objection") to the *Debtors' Motion for Entry of An Order*

*(I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation*

*Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or*

*Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and*

*Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined*

*Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined*

*Disclosure Statement and Plan* (the "Combined Plan" or "Plan"); *(VI) Approving the Form of*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification number, are Lumio Holdings, Inc. (7119) and Lumio HX, Inc. (7401).  The Debtors' headquarters is located at 1550 W Digital Drive, Suite 200, Lehi, UT 84043.

*Combined Hearing Notice, and (VII) Granting Related Relief* (the "Motion") [D.I. 380], and in

support of this Objection respectfully states:

## PRELIMINARY STATEMENT[2]

1.      The U.S. Trustee objects to approval of the disclosure statement and the Motion

because (1) the disclosure statement does not provide adequate information because the Plan and

the ballot are inconsistent as to whether those vote to accept the Plan will have the third-party

release imposed upon them simply by such vote; and (2) the Combined Plan is patently

unconfirmable for two reasons. First, the Motion seeks to implement a third-party release

contained in the Combined Plan without obtaining the consent of persons purportedly giving the

release because (a) it appears, based on the Ballot, that those who vote to accept the Plan will have

the release imposed upon them simply by such vote, and (b) all other creditors—including those

who reject the Plan and who are not entitled to vote—must opt out to avoid the release being

imposed upon them. Second, the Combined Plan's injunction provision is not authorized under the

Code and operates as a "back-door," non-consensual third-party release.

## JURISDICTION AND STANDING

2.      This Court has jurisdiction to hear and determine the Motion and this Objection

pursuant to 28 U.S.C. § 1334, applicable order(s) of the United States District Court for the District

of Delaware issued pursuant to 28 U.S.C. § 157(a) and 28 U.S.C. § 157(b)(2).

3.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the

administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S.

Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and

---

[2] Capitalized terms not defined herein shall have the same meaning given to them in the Motion or Combined Plan, as applicable.

interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

4.     The U.S. Trustee has standing to be heard on the Motion pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

### BACKGROUND

5.     On September 3, 2024 ("Petition Date"), the Debtors commenced the above-captioned cases by filing voluntary chapter 11 petitions in this Court.

6.     On September 11, 2024, the U.S. Trustee appointed an official committee of unsecured creditors ("Committee"). [D.I. 93].

7.     The Debtors filed a motion to approve bidding procedures in connection with the sale of substantially all of their assets (the "Bid Procedures Motion"). [D.I. 18]. The Bid Procedures Motion was granted on September 25, 2024 [D.I. 139] and the sale was approved on November 1, 2024. [D.I. 305].

8.     On December 13, 2024, the Debtors filed the Motion. Through the Motion, the Debtors seek interim approval of the disclosure contained in the Combined Plan [D.I. 379] and approval of procedures for the solicitation and tabulation of votes on the Combined Plan.

9.     The Combined Plan provides that creditors in Class 3 (Prepetition Secured Term Loan Claims) will receive their Pro Rata Share of the Prepetition Secured Loan Claims Distribution Amount, and thus they are Impaired and are entitled to vote on the Combined Plan. Combined Plan pp. 27-29; § 4.5. Class 3 is the only voting class. *Id*. Class 3 creditors are to receive

a Ballot that requests the vote of the holder of a Class 3 claim and requires the Holder to respond

if the Holder elects to opt out of the Third-Party Release:

**PLEASE READ THE VOTING INFORMATION AND
INSTRUCTIONS, ABOVE, BEFORE COMPLETING THIS BALLOT.**

**Item 1. Class Vote.** The undersigned, the Holder of a Class 3 Prepetition Secured Term Loan Claim against the Debtors hereby votes, in the amount set forth below, as follows (**check <u>one</u> box**):

☐ Accept the Plan

OR

☐ Reject the Plan.

Voting Amount of Claim:[3] $ _____

Debtor Claim is Against:[4] _____

**Item 2. Important Information Regarding the Third Party Release.** If you do not check the box below, you shall be deemed to have consented to the Third Party Release provision described in this Item 2 below and be bound by it.

Regardless of whether you elect to opt out of the Third Party Release provisions in the Plan, your recovery under the Plan remains unaffected.

The Holder of the Class 3 Prepetition Secured Term Loan Claim set forth in Item 1 elects to (optional):

> ☐ The undersigned has (i) elected not to vote on the Plan or (ii) vote to reject the Plan, and elects to **Opt Out** of the below Third Party Release (note that opting out of the release will result in you not being included in the definition of "Released Party" under the Combined Disclosure Statement and Plan).

Mot. ¶ 24-26; Ex. 3 ("Ballot"). The opt out language on the proposed Class 3 ballot suggests that,

if a holder votes to accept the Combined Plan, the holder cannot opt out of granting the Third-

Party Release.

10.    Holders of claims or interests in classes that are deemed to reject or deemed to

accept the Combined Plan are to receive a Notice of Non-Voting Status which includes an Opt-

Out Election Form, by which those holders of claims or interests must opt out of the Third-Party

Release to avoid having it imposed upon them:

**PLEASE COMPLETE THE FOLLOWING:**

    <u>**Item 1. Opt-Out for Third-Party Release.**</u>  By checking this box, the undersigned Holder of a Claim or Interest in Classes 1, 2, 4, 5, and 6:

    ☐    **Elects not to grant (and therefore OPTS OUT OF) the Third-Party Release contained in Section 10.7 of the Combined Disclosure Statement and Plan (which is copied on Schedule A hereto).**

    **PLEASE BE ADVISED THAT BY CHECKING THE BOX ABOVE YOU ELECT NOT TO GRANT THE THIRD-PARTY RELEASE AGAINST EACH PARTY THAT IS A <u>"RELEASED PARTY"</u> AS THAT TERM IS DEFINED IN THE PLAN.  <u>YOU MUST AFFIRMATIVELY CHECK THE BOX ABOVE IN ORDER TO OPT OUT OF THE THIRD-PARTY RELEASE.</u>**

Mot. ¶ 26-27; Ex. 5 ("Notice of Non-Voting Status").

***The Combined Plan***

    11.    The Combined Plan defines a "Releasing Party" as:

**(a) all Holders of Claims or Equity Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures, (b) each Released Party**, and (c) with respect to any Person or Entity in the foregoing clauses (a) and (b), the Related Party of such Person or Entity solely in their capacity as such (provided that with respect to any Related Party identified herein, each such Person constitutes a Releasing Party under this clause solely with respect to derivative claims that such Related Party could have properly asserted on behalf of a Person identified in clauses (a) and (b) of the definition of Releasing Parties).

Combined Plan Art. I, § 1.113. (emphasis added).

    12.    The definition of Releasing Party—which states that all of the foregoing categories, including those who vote to accept the plan, can opt out—appears to be inconsistent with the language on the Ballot that can be reasonably interpreted to not allow parties that vote to accept the Combined Plan to opt-out of the Third-Party Release. *See* ¶ 9 *infra*.

    13.    The Combined Plan defines a "Released Party" as:

(i) the current directors, officers, employees, agents, representatives, advisors, attorneys, investment bankers and financial advisors of the Debtors, (ii) the CRO, (iii) VRS Restructuring Services, LLC, (iv) Morris Nichols, as counsel to the Debtors, (v) Houlihan, as investment banker to the Debtors (vi) the Prepetition

Term Loan Secured Parties, including, without limitation, White Oak, (vii) the DIP Secured Parties, including, without limitation, White Oak, (viii) Porzio, as counsel to the Committee, (ix) members of the Committee, (x) Province, as financial advisor to the Committee, and (xi) the respective Related Parties for each of the foregoing to the extent such parties are or were acting in such capacity of or for any of the Persons identified in (i) through (x) above. For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) any predecessor of any Debtor or their subsidiaries, (ii) any former D&O of the Debtors, and (iii) Zeo, in each case, are not and shall not be deemed hereunder a Released Party.

Combined Plan Art. I, § 1.112.

14.    The Combined Plan's Third-Party Release provision states:

Releases By Creditors

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, except (i) for the right to enforce the Plan, and (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released by the Releasing Parties in each case, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law or equity, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date (including prior to the Petition Date), from, in whole or in part, the Debtors, the chapter 11 cases, the pre-and post-petition marketing and sale process, the Sale, the DIP Financing Facility or any related agreements, instruments, and other documents relating thereto, the purchase, sale, or rescission of the purchase or sale of any securities issued by the Debtors, the ownership of any securities issued by the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration or implementation of the Plan, including the issuance or Distribution of the Liquidating Trust Assets pursuant to the Plan, the creation of the Liquidating Trust, the business or contractual arrangements between any Debtor and any Released Party, the Settlement Term Sheet, the Disclosure Statement, the Plan (including any Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary to the foregoing, the releases set forth above do not release (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted willful misconduct, bad faith or gross negligence; and (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Combined Plan Art. X, § 10.7 (the "<u>Third-Party Release</u>") (emphasis removed).

15.    The Combined Plan also contains an injunction to enforce the Combined Plan and

the Third-Party Release:

Injunction.
(a) From and after the Effective Date, **all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)** are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan, from taking any of the following actions against the Debtors, **the Released Parties,** the Liquidating Trustee or the Liquidating Trust, or the property of any of the Debtors, **the Released Parties**, the Liquidating Trustee or the Liquidating Trust (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.
(b) Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Persons, shall be enjoined from taking any actions to interfere with the implementation or substantial Consummation of this Plan by the Debtors, the Liquidating Trustee and/or their respective Related Persons, as applicable.

**(c) By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the Injunctions set forth in this Section.**

Combined Plan Art. X, § 10.4 (the "<u>Injunction</u>") (emphasis altered).

## **ARGUMENT**

## I.   The Disclosure Statement Should Not Be Approved Because it Does Not Provide Adequate Information

16.     Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also In re Quigley Co*., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).   The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that ***would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*** . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).   The "adequate information" requirement is designed to help creditors in their negotiations with Debtors over the plan.  *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).   Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions.  *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp*., 228 F.3d 224, 248 (3d Cir. 2000).

17.    As noted above, the definition of Releasing Party—which states that all of the foregoing categories, including those who vote to accept the plan, can opt out—appears to be inconsistent with the language on the Ballot that can be reasonably interpreted to not allow parties that vote to accept the Combined Plan to opt-out of the Third-Party Release. *See* ¶ 9 *infra*. The disclosure statement should not be approved until the Debtors have addressed this inconsistency and made it clear whether voting creditors may opt out of the release.

## II.    The Disclosure Statement Should Not Be Approved Because the Plan Is Not Confirmable.

18.    If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied. *See In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(*citing *In re Beyond.com Corp*., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs*., 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

19.    The Combined Plan is unconfirmable for two separate and independent reasons.[3] *First*, the Combined Plan proposes non-consensual Third-Party Releases that are not authorized under the Bankruptcy Code. *Second*, the Combined Plan includes an injunction to enforce the third-party release that is not supported by any authority.

### A.    *The Plan Proposes Unauthorized, Non-Consensual Third-Party Releases*

### i.    State Contract Law Applies, Not Federal Law

20.    The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.,* 603 U.S. __,

---

[3]  The U.S. Trustee may assert additional objections to confirmation of the Debtors' Combined Plan. This Objection is limited to adequacy of disclosure objections and objections that should be cured prior to solicitation of the Debtors' Combined Plan because they address the solicitation procedures (such as the opt out mechanism in the ballots and non-voting notices). The U.S. Trustee reserves all of his objections to confirmation.

144 S. Ct. 2071, 2082-88 (2024).   The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

21.     Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law in some specific context. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

22.     No such exception applies here.   There is no federal law generally governing when or whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.   And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist as a matter of state law. Nor does 11 U.S.C. § 105(a) itself confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus,

the Bankruptcy Code does not change the state-law definition of consent as applicable to claims

among non-debtor parties.[4]

23.     As courts have recognized, because the Bankruptcy Code does not govern

relationships between claim holders and non-debtor third-parties, state-law contract principles

serve as controlling authority when considering whether a release is consensual. *See, e.g.*,

*Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing

bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law

rather than the bankruptcy court's confirmation authority to conclude that the validity of the

releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938,

at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent

that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.,* 576 B.R. 453, 458

(Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor

consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J.

1997) (explaining that a third-party release "is no different from any other settlement or contract"

and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-

contract law rather than upon the bankruptcy court's confirmation order") (internal quotation

marks omitted) (alterations in original).  As one court recently held, because "nothing in the

---

[4]  Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."  *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

24.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

### ii.     Under State Law, Silence Is Not Acceptance

25.     The "general rule of contracts is that silence cannot manifest consent." *Patterson,* 636 B.R. at 686 *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). Moreover, "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."). Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist. *See, e.g.*, *id.*; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

26.     There are only very limited exceptions to that principle. "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

27.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c (1981); *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

28.     Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)).  Absent limited exceptions not triggered here, silence and inaction are not assent to an offer.  *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).  For the reasons discussed below, none of those exceptions apply here.

### iii.   Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

29.     Applicable state contract law cannot be disregarded on a default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g.,*

*In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at \*8-\*11; *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 2024 WL 4296938, at \*1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

30.     After *Purdue*, however, it is now clear that imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 144 S. Ct. at 2082-88 & n.1; *see also Smallhold, Inc.*, 2024 WL 4296938, at \*2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold, Inc.*, 2024 WL 4296938, at \*10.

31.     As explained in *Smallhold*, the Supreme Court's *Purdue* decision rejected a fundamental premise of the decisions which had imputed consent for non-debtor releases on a procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold, Inc.*, 2024 WL 4296938, at \*1-2; *see also id*. at \*10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on

this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at *10. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

32.    But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested. *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."). "[After *Purdue*], that is no longer the case in the context of a third-party release." *Id*. at *13. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object

or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution.

*Id*. at *2 (footnote omitted). None of the cases that allow imposing of a non-debtor release based merely on a creditor's failure to object or opt out "provide[] any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id*.

33.    Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at *2. Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release. Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at *11 (emphasis added).[5]

### iv.  Merely Voting for a Plan Does Not Provide the Required Affirmative Consent

---

[5]  For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id*. at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

34.     It is not clear whether the Debtors propose that the non-debtor releases in the Plan bind all parties who vote to accept the Plan, but to the extent the ballot controls and the Debtors do intend to do so, because the Plan would impose non-debtor releases on these parties without their affirmative consent as to those releases, the releases are not consensual under state law and thus cannot be approved under *Purdue*.

35.     Such a procedure would conflate a vote for the Plan, which is governed by the Bankruptcy Code's provisions for adjusting relations between a debtor and its creditors, with acceptance of proposed third-party releases, which are contracts governed by state law dealing with relations between non-debtor parties.  Those are distinct legal constructs involving distinct parties:  the Plan disposes of a creditor's claims against the Debtor, while a third-party release disposes of its claims against non-debtors.  "[A] creditor should not expect that those rights [against non-debtors] are even subject to being given away through the debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938, at *12.  There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  Rather, for a creditor to be deemed to have affirmatively consented to the third-party releases, each creditor must have indicated express consent to be bound by a contract with the non-debtor beneficiaries of these releases.  A vote to accept the Plan cannot demonstrate consent to such a contract with a non-debtor.

36.     Such conflation of voting for the Plan with acceptance of the third-party release violates state law.  Voting for a plan disposing of claims against the debtor and its bankruptcy estate does not reflect the unambiguous assent necessary to find consent to a release of claims against other parties.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (concluding that, because consensual releases

are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

37.    First, creditors who vote for a plan are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received by the creditors are distributions from the debtor's chapter 11 plan.  Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222.  Because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent to the release from mere acceptance of those distributions from the debtor.  *See Norcia v. Samsung Telecomms. Am, LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017) (holding that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit).  Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

38.    Second, the mere act of voting on the chapter 11 plan does not "manifest[] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-

18

debtors.  Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.  *See Arrowmill*, 211 B.R. at 507; *Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Further, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they necessarily had any prior course of dealing with the released non-debtors that could conceivably impose such a duty.  *See, e.g., Norcia*, 845 F.3d at 1285-86.  Indeed, creditors do not have any affirmative obligation to act on a plan at all.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (explaining that creditors have no duty to speak regarding a plan such as could allow a court to infer consent from silence).  A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general state-law rule that consent cannot be inferred from silence.

39.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan."  *Id*. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *Digital Impact, Inc*., 223 B.R. at 14.  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt."  *Arrowmill*, 211 B.R. at 507.

40.     Further, a plan is a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person cannot be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan.  That is not consent under governing state law.  For those who believe the plan is the best way to maximize the return of their money from the debtor,

19

requiring them to vote "no" on the Plan solely because of an objectionable non-debtor release—thus raising the possibility that the Plan may not be able to be confirmed and they thus cannot receive the economic benefit under the Plan—would be penalizing them for exercising their right to vote in favor of the Plan.  If an offeree is penalized unless an "offer" is accepted, that circumstance "preclud[es] an inference of assent." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).  And as the *Smallhold* court recognized, if voting to accept a plan means a non-debtor release is imposed on the voter, that will discourage creditors from voting and may distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims.  *In re Smallhold, Inc.,* 2024 WL 4296938, at *7.

41.    In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation.  11 U.S.C. § 1129(a)(7)(A).  But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan).  Requiring a creditor to accept a non-debtor release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with Bankruptcy Code section 1129(a)(7)(A).

> **v.    Failing to Opt Out or Object Does Not Provide the Required Affirmative Consent**

42.    To the extent the Debtors are not seeking to impose the third-party release on all parties who vote for the Plan, the Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind all Holders of Claims or Equity Interests who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt out of the releases provided by the Plan in accordance with the Solicitation Procedures.

43.     An affirmative agreement — something more than the failure to opt out or object — is required for a non-debtor release to be consensual. *See In re Tonawanda Coke Corp.,* 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686. Failing to "opt out" of, or object to, an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.

44.     The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *See id*. The customer did not take any steps to opt out. *See id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id*. at 1282-83.

45.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an

agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

46.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

47.    The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond or when the offeree retains the offered benefits—but held neither exception applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

48.    Here, too, the debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### vi.    Voting to Accept a Plan Without Opting Out Is Not Consent to Release Non-Debtors

49.    Through the definition of "Releasing Parties" in the Combined Plan, the Debtors appear to propose that the non-debtor releases in the Plan bind all parties who vote to accept or reject the Plan but do not opt out.[6]

50.    *First*, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

51.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release, as discussed above.

52.    Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the

---

[6] The definition of Releasing Party—which states that all of the foregoing categories, including those who vote to accept the plan, can opt out—appears to be inconsistent with the language on the Ballot that can be reasonably interpreted to not allow parties that vote to accept the Combined Plan to opt-out of the Third-Party Release. *See* ¶ 9 *infra*.

23

offer to release claims against non-debtors.  Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

53.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d at 1285-86.  Ad as discussed above, nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence).  A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

### vii.   Voting to Reject a Plan Without Opting Out Is Not Consent to Release Non-Debtors

54.     *Second*, for the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the creditor has expressly stated its rejection of the Plan.  As the court in *Chassix Holdings, Inc.* reasoned, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

55.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

### viii.     *Smallhold*'s Conclusion that Voting Plus a Failure to Opt Out Equals Consent to a Non-Debtor Release Is Incorrect

56.     The U.S. Trustee recognizes that Judge Goldblatt in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent.  For the reasons discussed above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

57.     In *Smallhold*, Judge Goldblatt reasoned that consent to a non-debtor release could be understood to exist because the act of voting on a debtor's plan is an "affirmative step" taken after being told that failing to opt out would bind the voter to the non-debtor release.  *Smallhold,* 2024 WL 4296938, at *14. But while voting is certainly an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).

The bankruptcy exists to resolve debtor's liabilities, not those of third parties. And because, as noted above, *supra* ¶¶ 39-42, creditors have no affirmative obligation to act even as to the Debtors' plan, they certainly can have no duty to respond to an offer to release non-debtors of liabilities that exist outside the bankruptcy case entirely. Further, because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the non-debtor release.

58.     As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release. Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box. State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's mere failure to check an opt-out box on a ballot expressing views about the proposed treatment of a creditor's claims against the *debtor* (governed by *bankruptcy* law). *See supra* ¶¶ 34-42. As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it." *Id.* at *8 (emphasis added);

*accord* at *10 ("[I]t is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release.").

59.     Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent.  *Smallhold,* 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  Those cases emphasize the importance of notice as one prerequisite to consent, recognizing that "an offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious."  *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added).  Those cases thus concern the requirements for when someone can be deemed on "inquiry notice" of terms they did not read.  *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75.  But while notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient.  *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Whether there has been sufficient notice of an offer is a distinct question from whether there has been a manifestation of an intent to accept that offer, particularly where the offer—*i.e.*, the proposed third-party release—amounts to a side agreement governed by nonbankruptcy law and benefiting distinct parties.  As explained above, for that side agreement to be valid, there must also be a manifestation of consent to that agreement.  *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

### ix.   Not Voting and Not Opting Out—or Not Objecting—Is Not Consent to Release Non-Debtors

60.     *Third*, the Plan impermissibly imposes non-consensual third-party releases on those who do not vote on the plan, including (i) those who are eligible to vote but abstain and (ii) those who are not eligible to vote because they are deemed to have accepted or rejected the plan. Those eligible or ineligible to vote are apparently bound unless they return the opt out form. As numerous courts in this district have held, the releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 2024 WL 4296938, at *2; *SunEdison*, 576 B.R. at 458–61; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies equally to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan. Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan. The same is true for those who have no right to vote on a plan, such as the unimpaired creditors here who will be deemed to consent to releases unless they file an objection to them. Creditors who do not vote on a plan do not manifest consent to a nondebtor release by failing to return an opt out form or failing to object to confirmation.

61.     Even where there are conspicuous warnings in the ballots or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence as consent to the release. *SunEdison*, 576 B.R. at 458–61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[7] And creditors who have no intention of voting in the first place are unlikely to do so. Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially the case where, as here, the three classes of creditors are bound despite their silence unless they take specific, but different, actions: creditors

---

[7] Here, the Combined Plan and associated materials will run to at least 100 pages.

who vote must select the opt out box on the ballot; creditors who can vote but do not can opt out either through returning the ballot with the opt out box checked or by objecting to confirmation; and creditors who are not entitled to vote must object to confirmation. This creates unnecessary confusion and further demonstrates that the opt out process is a trap for the unwary.

62.     Thus, the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the Combined Plan should be deemed their consent to the release.  *Id.* at 460–61.  The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes).  *Id.* at 460-61.

63.     Simply put, as Judge Walrath has explained, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release."  *Washington Mut.*, 442 B.R. at 355; *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *Washington Mut.*, 442 B.R. at 355.

64.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix Holdings*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938,

at *12; *see also id.* at *10 (discussing *Chassix*).  As Judge Owens similarly explained in *Emerge Energy Services, LP*, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as implied consent through a party's silence or inaction.  No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake."  *Id.*

### x. There Was Insufficient Notice of the Non-Debtor Releases for There to Be Consent

65.     *Finally*, there is no acceptance of an offer when there is insufficient notice of the alleged contractual terms.  *See Norcia*, 845 F.3d at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.") (quotation marks omitted).  There is no way any creditor, no matter how sophisticated—even if it reviews every single document the Debtors provide or put on a website—can identify all the Related Parties who are included as Released Parties and thus, there can be no consent from any creditor to release those parties.

66.     Furthermore, failure to return the opt-out election form is not consent to the Third-Party Releases because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement."  *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d at

1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

xi.       **Rule 23's Opt-Out Rule Is Legally Irrelevant Because Congress Has Not Included Anything Like That in the Bankruptcy Code**

67.      In *Smallhold*, Judge Goldblatt raised the issue of whether opt outs could constitute consent because, under Federal Rule of Civil Procedure 23, a court-approved class action settlement may bind class members who do not opt out of the class action. *See Smallhold, Inc.*, 2024 WL 4296938, at *15. That analogy to class-action procedure is inapt. Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant. This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here. Fed. R. Bankr. P. 7023. Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

68.      And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out. Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id*. Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

69.      Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release. 28 U.S.C. § 2075. That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-

31

debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

70.    Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[8] 636 B.R. at 686.

71.    Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

72.    Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment

---

[8] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible." *Id.*

only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Opt-out procedures are only available in class actions under Rule 23(b)(3)—and not those under Rule 23(b)(1) and 23(b)(2). *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").)

73.    Class action procedures also entail additional procedural safeguards. A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

74.    Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)). And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)). "The inquiry appropriate under Rule 23(e) . . . protects unnamed

class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

75.    "None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party." *Id.*; *see also In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *12 n.53 (Sept. 25, 2024) ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others."). And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Patterson*, 636 B.R. at 686.  "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[9] *Id.*

76.    Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although the releasing creditors may receive a distribution under the plan for their claims against a debtor, they lose their claims against the released non-debtors and any corresponding compensation forever if they fail to take affirmative action to opt out or object. Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

---

[9] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

77.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out.  *See, e.g.,* Del. Super. Ct. R. Civ. P. 23.  But outside of that class-action context, ordinary contract principles apply as discussed above, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here.  ¶¶ 39-45, *supra*.

78.     In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual.

**B.      *The Plan Cannot Be Confirmed Because There Is No Authority for the Injunction Against Bringing Claims Against Non-Debtors***

79.     This Court also may not approve the injunction enforcing the release by barring claims against non-debtors.  *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue Pharma L.P.*, 144 S. Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 2085 (citing 11 U.S.C. § 524(e)).

80.     Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in

equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*).

81.     The Debtors have made no attempt to show that any of these factors are met. Nor could they. If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

82.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce an exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

83.     Especially egregious is the last paragraph of the Injunction, which purports to deem receipt of a distribution pursuant to the Combined Plan as "consent" to be bound by the Injunction,

(which enjoins any actions against Released Parties who may also be responsible parties in regards to a claim) without regard to whether the accepting creditor opted out, functioning as a back-door non-consensual third-party release of the Released Parties.

## RESERVATION OF RIGHTS

84.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, (i) complement, supplement, augment, alter or modify this Objection, (ii) assert any objection, (iii) file any appropriate motion, (iv) conduct any and all discovery as may be deemed necessary or as may be required, and (v) assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying confirmation of the Plan; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: December 30, 2024
        Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**

By: */s/ Joseph F. Cudia*
     Joseph F. Cudia
     Trial Attorney
     United States Department of Justice
     Office of the United States Trustee
     J. Caleb Boggs Federal Building
     844 King Street, Suite 2207, Lockbox35
     Wilmington, Delaware 19801
     Phone: (302) 573-6491
     Fax: (302) 573-6497
     Email: joseph.cudia@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph F. Cudia, hereby attest that on December 30, 2024, I caused to be served a copy

of this objection by electronic service on the registered parties via the Court's CM/ECF system

and upon the following parties:

**Morris, Nichols, Arsht & Tunnell**
Robert J. Dehney
Scott Jones
Matthew O Talmo
Erin Williamson
1201 N. Market Street, Ste 1600
P O. Box 1347
Wilmington, DE 19899-1347
Email: rdehney@morrisnichols.com
sjones@morrisnichols.com
mtalmo@mnat.com
ewilliamson@morrisnichols.com

_/s/ Joseph F. Cudia_

Joseph F. Cudia